*B. & A. Monroe* for appellant.

---

## Shultz & Co. *vs* Johnson's Administrator.

ERROR TO THE MASON CIRCUIT.

*Covenant, personal.*

JUDGE BRECK delivered the opinion of the Court.

COVENANT.

*Case* 107.

*June* 16.

The case stated.

THIS was an action of covenant, brought by William H. Johnson, administrator of Elijah Johnson, against the plaintiffs in error, upon the following obligation:

"An agreement made this day between Elijah Johnson, of the first part, and C. Shultz & Co., of the second part, all of the county of Mason, and State of Kentucky, witnesseth: that the said Elijah Johnson, of the first part, engages to furnish C. Shultz & Co., of the second part, *six successive crops of hemp of his own raising, embracing each year all the hemp he can raise upon not less than one hundred, nor more than one hundred and sixty acres of land each year,* the hemp to be well cleaned, and of fair quality for the season in which it is raised, and delivered to the said C. Shultz & Co. in Maysville, within a reasonable time after the breaking season in each year; and upon the delivery of each crop, as above, the said C. Shultz & Co. is to pay him, the said Johnson, at the rate of five dollars for each and every one hundred and twelve pounds of hemp, excepting the present crop, the growth of this year—this crop is supposed to be about ten or twelve tons, and is to be delivered any time between the first of January, 1841, and the first of Aug. next, at the election of said Johnson, for which he is to

receive of C. Shultz & Co. the cash market price in Maysville, at the time of delivery.

MAYSVILLE, Sept. 29, 1840.

> *Elijah Johnson,*
> *C. Shultz & Co.*

The declaration alledges, that Johnson departed this life, in the county of Mason, in 1842, intestate—that he delivered the crop of hemp on hand at the date of the covenant sued on, and went on to raise from one hundred to one hundred and sixty acres of hemp in each year, and to deliver the same according to his contract, till his death—that after his death, the plaintiff, as his administrator, with the aid and assistance and approbation of the heirs of said intestate, went on to prepare for market, and deliver the crop, which was growing in 1842, at his death, all of which crops were received and paid for by the defendants. That still further complying with said contract, the plaintiff, with the aid and assistance of the children and heirs of his intestate, proceeded, in the spring of 1843, to sow and in that year to raise one hundred and sixty acres of hemp, on the farm on which his intestate died, and of which he was seized when said contract was made. That the crop thus raised in 1843, the defendants refused to receive, claiming by the death of the intestate, to be released from said contract.

Various pleas were filed by the defendants, to several of which issues were made up, and the residue were disposed of by demurrer, either to the plea or the replication.

A verdict and judgment having been rendered for the plaintiff, the defendants have brought the case before this Court for revision.

The principal question in the case arises upon the demurrers to the second and seventh pleas. The second plea alledges, that to raise and prepare hemp for market, is a matter of much science and skill, and knowing that said Johnson possessed the requisite science and skill for that purpose, the defendants entered into the contract sued on, by which they agreed to take six successive crops of hemp of his, *the said Johnson's own raising*, and none other, and that the crop of hemp of 1843 was rais-

ed by the plaintiff, and that under said contract they were not bound to receive and pay for the same.

The seventh plea alledges, that the hemp tendered by the plaintiff to the defendants, was not hemp of Elijah Johnson's own raising.

Whether the Court below was right in sustaining demurrers to these pleas, presents the first and most important question for consideration.

The demurrer brings up the sufficiency of the declaration, which depends upon the construction of the contract.

It is contended for the plaintiff's in error, that the contract died with Johnson, and of course that the administrator or plaintiff below, could not maintain the action.

The contract is drawn concisely, and saving the expression, *of his own raising*, very perspicuously. And even in regard to that clause, we have less difficulty in determining what the parties intended by it, than in determining what effect it should have upon the contract.

The rule is well settled, that in the interpretation of contracts, they should be so construed as clearly to carry out the intention of the parties, notwithstanding such construction might be a departure from the strict letter.

In view of this rule, let us examine the contract in question.

It is perfectly evident that it was not contemplated by the parties, that the hemp upon not less than one hundred, nor more than one hundred and sixty acres, was to be raised by the labor of Johnson alone. The labor of a single individual would obviously be utterly inadequate to such an undertaking; and the expression *of his own raising*, must therefore, receive a different and more liberal construction.

It is recited in the covenant, that both parties reside in the county of Mason, and we have a right, we think, to presume, from the subject matter, as well as from the terms of the contract, that Johnson was a farmer of that county, and in the habit of raising hemp—that he had land, and, to use a common expression in reference to labor, had the requisite *force* for cultivating as much thereof in hemp as required by the contract. As a farmer

SHULTZ & Co.
*vs*
JOHNSON'S AD'R.

Contracts should be so construed as to carry out the intention of the parties, tho' it may be necessary to depart from the strict letter.

SHULTZ & Co.
vs
JOHNSON'S AD'R.

and a *hemp grower*, possessed of the land and the labor, therefore, he entered into the contract, stipulating to furnish Shultz & Co. with all the hemp *he* could thus raise in each year for six successive years, upon the specified quantity of land. The hemp and crops which he might thus raise, would be *of his own raising*, according to the general import of the expression, and in that sense the parties, no doubt, understood and used it.

But conceding, as contended by counsel, that Johnson could perform the contract, by renting the land and hiring the labor, still the expression, *of his own raising*, very clearly implies that his vocation and business was farming and raising hemp, and that the several crops which he stipulated to furnish, were to be his own crops, raised by him or under his personal superintendence and direction. The provision, that the hemp was "to be well cleaned, and of fair quality for the season in which it was raised," is not at all inconsistent with this construction. It defines the quality, while the expression, *of his own raising*, identifies the hemp, the crops which he was to deliver, and by whom to be raised.

Assuming this to be the proper construction of the contract, the question arises, whether it belongs to that class of *personal* contracts, which do not survive to the executor or administrator, but die with the testator or intestate.

The general rule is, that the executor is bound to perform, and may also enforce, whether named in them or not, all the personal contracts of his testator. To this rule, however, contracts or agreements, which require something to be performed by the testator *in person*, form an exception. But this exception is not defined and limited in the books, with such precision as to render it always easy to determine whether particular cases fall within it or not. Judicial decisions upon the subject, are rare, and have but little tendency to free it from difficulty.

As a general rule, the personal representative is bound to perform the contracts of his testator or intestate whether named or not, unless something is to be done by the person contracting.

In *Chitty on Pleadings*, 1st vol. 58, it is said that "no action lies against an executor upon a covenant to be performed by the testator in person, and which, consequently, the executor cannot perform."

The rules by which contracts are determined to be personal.

In *Chitty on Contracts*, 98, it is laid down, that "death is in general, no revocation of an agreement, but it may,

unless it be a personal engagement, to be performed by the testator himself only, and requiring his personal skill or taste, be completed by his executor."

In *Williams on Executors*, it is said, "no liability attaches upon the executor or administrator, where the contract is *personal* to the testator or intestate, unless a breach was incurred in the lifetime of the deceased." The exception is similarly defined in *Newland on Contracts,* and by other writers.

The cases put in illustration of the rule are, a promise to marry—the contract of a master for the instruction of his apprentice—of an author to compose a particular work—of the physician or lawyer to render services in their respective professions. In these cases, the personal attention and services of the contractor are indispensable for the performance of the contract. The law tolerates no substitute. It requires a party to accept nothing but the *pound of flesh.* Yet these contracts do not acquire their peculiar character from the degree of ability, skill or experience, which the contracting party may possess. A contract with the most indifferent writer, artist, physician or lawyer, would be equally *personal*, and die with the party, as with the most able, skilful and eminent. What then, is the controlling characteristic of such contracts? Are they governed by the nature of the services to be rendered, of the thing to be done or produced? Or do they depend upon the supposed confidence and reliance upon the ability, skill, taste and experience alone of the contractor?

In some cases, the subject matter of the contract, as a contract to marry, would alone determine its character. In others, it would be determined by both the subject matter and the profession or avocation of the person undertaking to perform it, as in the case of the author or of the physician.

But the question, we think, in every case, must turn at last upon the intention of the parties. If the intention be that the contractor alone, in person, is to perform the contract, and that it is not to be performed by any other person, such a contract, it seems to us, would be *personal* in the sense in which we are considering it. Or, in other

If the parties intended the contract to be personal, it should be so held and treated.

words, if the parties intended the contract to be personal, no matter what the subject matter might be, it must be so regarded and treated. In the cases referred to, the law implies such to have been the intention of the parties, and they are, on that account, and on that alone, held to be *personal*. But whether the law implies the intention from the subject matter of the contract, and the character of the parties, or whether the intention is manifested by the parties in express terms in the contract itself, can make no difference. The character of the contract would be the same in the one case as the other.

Had the contract in this case been for the delivery of all the hemp which could be raised during six successive years, upon not less than one hundred, nor more than one hundred and sixty acres of land, the law would hardly imply, from the subject matter of it, and the character of Johnson, admitting him to be a farmer and a hemp grower, that it was the intention of the parties, that the hemp was to be raised by Johnson alone, and that Shultz & Co. would not be bound to receive it, if raised by any other person. But the parties, by their agreement, we think, have gone that far. The express terms of it, leave no doubt that such was their intention. But it is insisted that the object of inserting the clause, *of his own raising*, was to prevent Johnson from buying hemp, and others deriving a speculation, to the prejudice of Shultz & Co., as the article might command more or less than he was to receive under his contract—if more, to select and purchase the crop upon land yielding the smallest quantity, but if less, then to have land yielding the largest quantity to the acre. Such may have been one object of this provision, but it also secures to Shultz & Co. hemp raised by Johnson, and relieves them from the liability to take a pound raised by any other person. The hemp is to be of Johnson's *own raising, embracing all the hemp "he" can raise upon not less, &c.*

It is true, as insisted by counsel, that hemp is a coarse, raw material; but it is also true, that it is an important and valuable staple, and we have a right to presume that its value greatly depends upon the attention, experience, and skill in raising and preparing it for the use of the

manufacturer.  We think we have  also a right to know
that hemp known to be raised by one individual, will often command a higher  price  and a more ready sale, than hemp raised by another, although there might be  very little seeming difference in the quality.   It is so in regard to other great staples, as tobacco and cotton; much often depends upon the *brand.*  Such also, is the case in regard to the fabrics of the artizan and manufacturer.   But to what extent these considerations may have had an influence  with Shultz & Co. in  entering into this contract, cannot and need not be determined.  It is sufficient that it was the intention of the parties that in the production and preparation of the hemp which Shultz & Co., under the contract, were bound to receive, the attention, skill, and experience of Johnson were to be employed.   As to the degree of skill and experience which he might possess, and its value, Shultz & Co. were and had a right to be the sole judges.   Much or little, they had a right to contend for and rely upon it.   During the life time of Johnson he  could substitute no  person to perform  this contract and obtain the benefit of it.   It was no more assignable than an  apprenticeship, which is held to be neither assignable nor transmissible, (8 *Mass. Rep.* 299,) not because another might  not be equally competent for the control and instruction of the  apprentice, but for the reason  that the undertaking was *personal* and a *personal* trust implied.   Nor is this contract any more  assignable than the case stated by *Chitty on  Contracts* 739, and which he  terms *personal*; he  says,  "when a contract is made by a  coach  maker to furnish a carriage and keep it in repair for a certain term,  this being  a  *personal* contract, if the coach maker transfer or sell his business and interest in the contract to another person,  the party who hired the carriage may treat the agreement as at an end, on the ground that  the coach maker had become incapable of performing his part of it."

If then the assignee of Johnson, although possessed of the requisite skill and experience, could  not perform the contract during his life, will the law, after his death, devolve the duty upon his administrator?   Will the law appoint a substitute to perform  it when  Johnson  himself

could not appoint one, and for the best of reasons, because the parties had expressly agreed that there should be none? We think not. The administrator, as such, would have no control of the land or the labor, and might,

S. contracted with J. to receive and pay for at a certain price, all the hemp which J. should raise for six successive years, or not less than 100 nor more than 160 acres of land, *of his own raising*; J. died and in a suit by his adm'r. vs S. for refusing to receive and pay for a crop raised after the death of J.; held that the contract was personal, and that it could not be performed by J's. adm'r.

besides, be entirely destitute of the requisite skill and experience, and therefore, be compelled himself to resort to a substitute for its performance.

We are of opinion the parties intended the contract to be a *personal* one. As such the administrator was not bound to perform it, and of course not entitled to enforce it.

It results that the Court below erred in sustaining the demurrers to the defendants' pleas.

Wherefore the judgment is reversed and the cause remanded, that the demurrers may be overruled and judgment thereupon for the defendants, by reason of the insufficiency of the plaintiff's declaration.

