JOHN M. MUELLER, Jr.

*v.*

THE NORTHWESTERN UNIVERSITY.

*Opinion filed February 21, 1902.*

1. CONTRACTS—*parties may provide that contract shall not be assigned.*
The parties to a contract may in terms prohibit its assignment,
so that an assignee cannot succeed to any rights under the con-
tract by virtue of the assignment thereof to him.

2. SAME—*courts may follow construction given to doubtful contract by
the acts of the parties.* If the construction of a contract is doubtful,
and the parties have given a construction thereto by acting in a
particular manner, courts will usually follow the construction so
adopted by the parties.

3. INTEREST—*complainant in a bill of interpleader not liable for inter-
est for withholding fund.* Complainant in a bill of interpleader is not
liable for interest where both defendants to the bill claimed the
fund, which was withheld by the complainant at the request of one
of the defendants, and the delay in payment was not the fault of
the complainant.

*Mueller* v. *Northwestern University*, 95 Ill. App. 258, affirmed.

APPEAL from the Appellate Court for the First Dis-
trict;—heard in that court on appeal from the Circuit
Court of Cook county; the Hon. R. S. TUTHILL, Judge,
presiding.

This is an appeal by John M. Mueller, Jr., from a
judgment of the Appellate Court for the First District
affirming a decree of the circuit court of Cook county dis-
missing his cross-bill for want of equity and overruling
exceptions filed by him to the master's report.

On the 28th day of May, 1898, the Northwestern Uni-
versity exhibited in the circuit court of Cook county
its bill of interpleader against John M. Mueller, Jr., and
other defendants, setting forth that it had in its hands
$4403.39 remaining unpaid on its contract with Fred H.
Sammis for the marble mosaic and tile work in the Illi-
nois Trust and Savings Bank, a building constructed
by said university in the city of Chicago on premises
described in the bill; that several defendants, including

Mueller, were claiming said fund, and it offered to bring the money into court, etc.   To this bill Mueller filed his answer and a cross-bill, claiming as due him from the university for materials used in said building, furnished by him to the said Sammis, not only said $4403.39, but an additional sum of $7739.30 paid by said university to Sammis after notice, and in disregard of an assignment thereof made by Sammis to Mueller on December 4, 1896. Answers and replications were filed, and the cause was referred to the master to take proofs and report his conclusions as to the law and the facts.   Objections and exceptions having been overruled to the master's report, a decree was entered directing said fund to be paid to Mueller, and his cross-bill was dismissed.   The only question now before this court is that of the dismissal of the cross-bill, and the only errors assigned herein are those which arise upon that part of the final decree which dismisses said cross-bill.

For many years prior to the second day of November, 1896, the Northwestern University was the owner of the premises sought to be improved.   Shortly prior thereto it entered into a contract with the Illinois Trust and Savings Bank by which the old improvement was to be torn down and the present building constructed on said premises, which new structure was to be ready for occupancy by the first day of May, 1897.   On the second day of November, 1896, the university made a contract with Sammis, whereby he agreed to furnish and put in place the marble and mosaic work in said building for the sum of $27,344.   Among other things, the contract provided that the work was to be delivered by him to the university completely finished, free from all liens, claims or charges, on or before the first day of April, 1897; that payments on account of said improvement should be made upon written certificates issued by the architects from time to time as the work proceeded, but that the total sum of such payments on account should at no time

exceed eighty-five per cent of the value of the materials used and the labor performed, as estimated by or for the architects, less the total amount of accrued liens as disclosed by the contractor's affidavit or notice required by the laws of the State of Illinois, which certificates so issued by the architects were to be paid by the owner immediately upon presentation, and a final settlement as to the remainder, and for all extras, if any, should be had and payment made forty days after the work had been completed, free from all liens, charges and claims whatsoever, upon the certificate, in writing, of the architects, and it was expressly covenanted and agreed "that the contractor shall not sell, assign, transfer or set over this contract, or any part thereof or interest therein, unto any person or persons whomsoever, without the consent, in writing, of the architects previously had and obtained thereto, and any such sale, assignment or transfer without such written consent of the architects first obtained thereto shall be absolutely null and void."

D. H. Burnham and Ernest R. Graham, doing business as D. H. Burnham & Co., were named as architects, and Sammis, at the time of the execution of said contract, entered into a bond, with John M. Mueller, Jr., as surety, in the penal sum of $8000, to protect the said proposed building and premises from any mechanic's or other lien. At about the time of the execution of said agreement Sammis entered into negotiations with Mueller, who was a dealer in marble doing business at Cincinnati, Ohio, for the purpose of obtaining through him the necessary material which he was to use in said building and to procure through him said bond. Afterwards an arrangement was perfected between them, by which Mueller was to furnish Sammis the marble needed to fill his contract and by which Mueller became surety for Sammis upon said bond.

On the third day of December, 1896, and after the bond had been executed and delivered, Mueller tele-

graphed to D. H. Burnham & Co. asking to be relieved from said bond, and later in the day wrote them as follows: "In further explanation of my telegram sent you to-day, to consider my bond for F. H. Sammis withdrawn, you no doubt understand that I am to furnish marble under Mr. Sammis' contract. I am quite willing to carry out this sub-contract under Sammis, but he promised me, before the furnishing of the bond, to arrange in some way to secure me against losses and for the payment of the marble to be furnished. He has failed to do this, and as the time is passing rapidly for securing the imported marble, and I understand that Sammis is owing a number of bills and it may be doubtful whether he can carry out his contract, I have wired you as I did to-day. I learned that Sammis was willing and was arranging to have the payments to accrue under this contract made payable to me for my security. Will you please write me whether he has done this; and secondly, whether you will grant an extension under the contract for the furnishing of this imported marble, and if so, how long; and lastly, whether you will compel Sammis to secure another bondsman and release me."

Without waiting for an answer to this letter or having received an answer to said telegram, on the fourth day of December following, Mueller telegraphed to D. H. Burnham & Co. saying that everything between him and Sammis was satisfactory, and later in the day wrote to them concerning said telegram, as follows: "Mr. Sammis put in his appearance here to-day, and after some explanation I learned that I had become unduly alarmed, and for this reason I telegraphed you as follows: 'Unduly alarmed about Sammis; everything satisfactory; order for marble placed.' The words of the telegram I beg herewith to confirm. I received a telegram here from a gentleman in Chicago which was very detrimental to Mr. Sammis, but I have learned from Mr. Sammis himself that the information conveyed to me by this message

was far from being true.   For this reason I will go right ahead ordering this marble for the bank job, saw it, and have it finished by the time Mr. Sammis can begin setting in the marble in the building itself."

. On December 4, 1896, and while Sammis was in Cincinnati, he executed and delivered to Mueller the following instrument in writing:

"CINCINNATI, OHIO, *December 4, 1896.*

"It is agreed by and between Fred H. Sammis and John M. Mueller, Jr., that inasmuch as said Mueller signed the bond of said Sammis in favor of the Northwestern University board of directors of Chicago for $8000, providing that said Sammis shall complete and faithfully carry out his contract with said university owners to furnish the marble and tile work required in a new building said owners are about to erect, said contract price being about $27,430, and in consideration thereof the said Sammis agreed to fully indemnify and save harmless said Mueller from any loss by reason thereof; and whereas, said Mueller is also a sub-contractor under Sammis to furnish certain imported marble for said building, and said Mueller desires, in addition to his protection under the Illinois lien laws, and without waiving same, to be protected for such materials and to secure other liabilities now owing and which may become owing to said Mueller from said Sammis growing out of the said premises or out of any other business in the future, said Sammis hereby agrees and does transfer to said Mueller all the moneys, credits or choses in action, estimates, orders, etc., which may be made payable to him or come to him under this (Sammis') contract, or extra work and materials to be furnished by said Sammis, directly or indirectly, by said owners and their architects and superintendents, except only such sums as may be due or owing to other material-men, sub-contractors or laborers outside of Mueller, and which said owners or their agents are compelled by the lien laws to pay, and for the actual sums due the same, respectively.   It is agreed that such moneys and credits shall be retained by said Mueller and applied to any indebtedness which he may owe against said Sammis, and that the surplus, if any, in payment of all debts, losses and damages accruing to said Mueller by reason of the premises shall not become due or payable until said indebtedness to said Mueller, as aforesaid, shall be fully paid and said building completed and said contract between said Sammis and said owners fully car-

ried out, and the entire money provided for said Sammis in his said contract with said owners, together with extras, shall be fully paid to said Mueller and said Mueller fully protected in the premises.  Said Sammis agrees that at any time hereafter he will execute such further orders, transfers and documents which may become necessary to carry out this agreement, or which may be required by said owners, their architects and superintendents, or which said Mueller may demand.

FRED H. SAMMIS,

Witnesses:  JOHN M. MUELLER, Jr.

  OTTO PFELGER and F. E. NIEDERHELMAN.'

On December 7, 1896, D. H. Burnham & Co. answered Mueller's letter of December 4, as follows:  "We have your telegram and letter of 3d inst. and your telegram and letter of 4th inst., regarding the bond of Fred H. Sammis, who has the contract for the marble work of the Illinois Trust and Savings Bank of Chicago.  In reply to the question contained in your letter of the 4th inst., we beg to advise you that no extension of time will be allowed for the completion of this work.  In reply to your other question contained in the letter of the 4th inst., we beg to advise you that no agreement has been made between Mr. Sammis and ourselves looking to secure payment to you for the material furnished to Mr. Sammis for the work in question."

Four days later, and on the 11th day of December, Mueller wrote D. H. Burnham & Co., as follows: "I have your letter of the 7th inst., regarding the marble contract of F. H. Sammis for the university building of the Illinois Trust and Savings Bank.  As I wired you, we arranged the bond matter with Mr. Sammis, and I hope that the marble contract will be satisfactorily completed if the other contractors do not delay in the work, and you will have the building with this work, as agreed upon. I think the contract will be completed in time.  You are no doubt aware that this marble must come from Africa. No doubt Mr. Sammis has informed you that he has secured me by a transfer of the moneys coming to him under his contract, to secure me for the marble, for the

195—16

bond and for the indebtedness, excepting the amount actually due laborers and material-men under Sammis. As I understand it, you will require every month, at stated periods, reports through Sammis of the amount of labor performed and the materials furnished, and I shall be glad to furnish such statements through Mr. Sammis, or directly, whenever you desire."

At the time of the execution of the agreement between Sammis and Mueller, on December 4, it was understood between them that Sammis was to notify D. H. Burnham & Co. of the execution thereof upon his return to Chicago the next day.    This he failed to do, and the only notice that D. H. Burnham & Co., or the university, had of the execution of such agreement was the notice contained in the letter of December 11 from Mueller to D. H. Burnham & Co.    Mueller commenced furnishing material, which was shipped to Chicago to Fred H. Sammis, agent, and prior to May 1, 1897, had furnished material to an amount aggregating about the value of $17,142.69.    The building was substantially completed and was occupied by the bank on or about May 1, 1897.    While there was considerable correspondence between D. H. Burnham & Co. and Mueller with a view to hurrying forward the material, Mueller had no communication with them or with the university in regard to the payment therefor after his letter of December 11 until after the building had been completed and accepted.    Sammis furnished extra labor and material to the amount of $509.39, which, together with the contract price of $27,344, aggregates the sum of $27,853.39, and is the full amount due under his contract with the university, upon which he has been paid upon architects' certificates the following amounts at the times mentioned: March 15, 1897, $600; March 29, 1897, $1500; April 8, 1897, $2000; April 15, 1897, $4000; April 24, 1897, $9500; May 1, 1897, $5000, and May 21, 1897, $850, which aggregate the sum of $23,450, and leave remaining due and owing under said contract, including said extra labor

and materials, the sum of $4403.39, which is the amount mentioned in the bill of interpleader as remaining due.

Sammis testifies that after the agreement of December 4, 1896, was executed, Mueller and he left the office of the attorney who prepared the same, together; that during the dinner hour they discussed the matter of collecting the moneys under his contract with the university as the same should fall due; that during said conversation he said to Mueller, in effect, that if the assignment was to be carried out it would be necessary that Mueller go to Chicago to look after the paying of the men who were to do the work upon said building, etc.; that Mueller declined so to do; that it was then agreed between him and Mueller that he should collect all the moneys to become due under said contract, the same as he would have done in the absence of said assignment, and that after paying for labor, materials, etc., he was to account to Mueller for the portion thereof going to him under said assignment. This conversation Mueller denies.

After the receipt of Mueller's letter of December 11, D. H. Burnham & Co. showed the same to Sammis, and on the 22d day of December, 1896, Sammis wrote to Mueller as follows: "The reason I speak of this is the fact they want your address, claiming they want to write you regarding marble chips, but I concluded they had said something to Graham, and he told them you was back of it, or had showed your letter. He handed it to me, and I was surprised, for our understanding was, nothing was to be said unless some one attempted to make trouble, of which I have no fear. However, it can do no harm, further than it may hurt me in Burnham's office; but I want everyboby paid, and any profit there is I want to fall in your hands for me."

On the following day Mueller replied to said letter, as follows: "I wrote Mr. Burnham in the strain that I did a few days ago, simply in answer to a communication of his. You told me when you were here that you would

tell Mr. Graham the coutents of the agreement which I made with you, or which we mutually agreed upon, and if you did this my letter would not change matters in the least. You speak and state matters truthfully when you say that I am perfectly willing to assist you, as I have told you on several occasions I will do this, but expect you to treat and do business fairly with me. Whenever you get any marble work or secure any marble jobs I will be glad to supply the marble, providing, of course, that you see that I get my money. I must look out for this. I can't do business without getting my money, and this you can very readily see and you understand perfectly well. On any jobs that you secure let me take the money, and when I get myself paid I will hand whatever balance there is in my hands to any person or persons you may designate. After all bills are paid the balance in my hands is your profit, and you can have it."

On the first day of May,—the day the Illinois Trust and Savings Bank moved into the building,—Sammis obtained a certificate for the sum of $5000. On May 5, 1897, Mueller wrote Sammis: "I hope that you will get a good, first-class settlement out of Burnham for the bank job, and will make every cent of extras that you claim. If you succeed, as you doubtlessly will, in getting some funds for the bank building job, let me have as much as you possibly can, or let me have the amount which is due me."

Within a day or two after receiving this letter Sammis went to Cincinnati and took with him the $5000 received from the university on May 1, and gave it to Mueller to apply on his account for the marble in question, which amount Mueller says he supposed Sammis received from the bank building. Sammis testifies that he told Mueller that he got this money on an estimate for work done upon that job. On May 25, 1897, Mueller wrote Sammis as follows: "By all means get done with the marble work in the bank building by the first of the month, so

that you can get this (bank) contract closed up and get your money and in turn favor me with a check for the moneys which are due me. I need the money, and that the worst kind. I never in all my experience in the marble business was so crowded or pressed for funds as I am at the present time. This is owing to no other reason than simply because my funds are now tied up in the job which you are now completing."

On the 27th day of May, as follows: "I hope that you will get done with this floor, and that, too, quite shortly, so that D. H. Burnham & Co. will give you a settlement in full of your account."

On June 9, 1897, as follows: "I am very seriously pressed for funds. I expect you to be here quite soon with a remittance or with a draft for the amount of money which is due me. I have promised several of my pressing creditors that on or about the 15th inst. I will be in shape to liquidate my entire indebtedness to them."

On June 11, 1897, as follows: "Just as soon as you get matters fixed up with Burnham & Graham for the bank building, try and make it convenient to come here and let me have the money which is due me on the bank building, and also on the Clinton and Wheaton job. I don't want to be too urgent in my demands, but my creditors here have been put off from month to month with the promise that I would settle their accounts, but thus far I have been unable to do so. All the money which I get in now, in the way of collections, I am using here in the way of paying for wages, and all the material I am getting has not been paid for. So let me see you here at just as early a date as you can make it convenient to come."

On June 17, 1897, as follows: "I had all along hoped that you would get your money for the marble work which you did in the bank building before Tabor & Co. would take steps in trying to tie up these funds of ours. If you had followed my instructions or done as I wished you to do some three or four weeks ago, by accepting

or giving me an order on D. H. Burnham & Co. for the amount of money which is due me, Tabor & Co. could not do anything at all with me. I could bring them here to Cincinnati to do the fighting, if any fighting was to be done. As it is, Tabor & Co. look to me for the funds which I owe them."

On June 19, 1897, as follows: "I regret very much indeed to learn of your having such a difficult time in getting a settlement from D. H. Burnham & Co. for the marble work which you done in the bank building, and also that Tabor & Co. are causing you so much trouble. From the letters which I received from you during the past few days I thought that you already had settled with D. H. Burnham & Co. and beat Tabor & Co. at their own game. From your present letters, however, it would seem that you are not as yet done with Burnham & Co. or have not as yet reached any settlement with them, and also that Tabor & Co. are still in the way of your getting your money. * * * I am needing money, and that the worst kind. I have been putting off some of my creditors from day to day, telling them that I expected to get some funds from you, and they are seriously disappointed because I am not making good my words or my promise. Can't you send me at least a remittance on account? You owe me, according to my figures, some $16,000, and you should be able to send me at least $10,000 on account. It is not right or fair to keep this amount of money from me, especially so as I owe it to other parties. I will not pay Tabor & Co. in full until I see you, but there are other creditors who are deserving of their money."

On May 15, 1897, Mueller had written Sammis as follows: "I hand you enclosed an order for $14,133.74, made payable to Charles J. Boeh, which be good enough to accept yourself and also get D. H. Burnham & Co. to accept it, and return it to my address at once. By giving this matter your prompt attention you will be conferring a favor." Enclosed therein was the following order:

"CINCINNATI, *May 15, 1897.*
"*Mr. F. H. Sammis, Chicago, Illinois:*

"DEAR SIR—Please pay to the order of Charles J. Boeh the sum of fourteen thousand one hundred and thirty-three dollars and seventy-four cents ($14,133.74), moneys which remain or are due for marble furnished for Illinois Trust and Savings Bank, and charge same to my account.          JOHN M. MUELLER, Jr."

On June 5, 1897, in a letter from Mueller to Marthens & Mead of Chicago, he says: "I have received in to-day's mail your valued letter of the 4th instant, and note its contents with the greatest of care.   *   *   *   Now, with reference to Mr. Sammis' business or his accounts, I beg to inform you if he has told you that the settlement of the Illinois Trust and Savings Bank building is in my hands he has misrepresented the facts to you. I do not have anything at all to do with the money. He collects the money for the work that he has done and remits to me the amount of his purchase or for the marble which I furnish to him. You can plainly see, and will understand, that if the settlement of the bank job was in my hands that I would be only too glad to keep the amount of your claim out of the money coming to Mr. Sammis. There is no reason or I have no cause why I should not do this for you, but the facts are just as I give them to you. Mr. Sammis has the contract for the bank job, collects his money and sends me the amount of my bill for the marble which I furnished him for this job. If you can induce Mr. Sammis to give you your money or to pay you for the amount which he owes you, well and good. This is the only way that I can see that you can get your money out of him. I have no money belonging to him nor have I any way of collecting this claim of yours. I am frank with you, and have nothing at all to hide. I would not have returned the notes of Mr. Sammis to you, or, rather, would not have returned his account to you, if I saw any means or any way of collecting your claim."

Mueller's attention was called by his counsel to the letter to Marthens & Mead, and he was asked "if he stated the facts at the time he wrote it," to which he replied: "No, sir; it did not state the facts. I misrepresented the thing in the letter." His attention was also called by his counsel to the letters which he had written to Sammis, and he was asked: "There are several letters introduced here with respect to money that was due under this contract, which you wrote to Mr. Sammis. I wish you would explain to the master what you refer to in these letters —what you mean by the statement 'your money,' in your letters?" to which he replied: "Well, Mr. Sammis always cautioned me not to write to Burnham & Graham for anything—to let him attend to it; and if there was anything that I wanted, I should write to him and tell him to do so and so, and so and so. Of course, he did not want Burnham or Graham to know that he was not capable of carrying on that work, after having turned everything over. I don't know exactly how he stated it. He didn't want to be queered in Burnham's office, because this job would be the means of getting all Burnham & Graham's work from that on; and certainly we did not want to do anything to hurt him, and I wanted to see Sammis get all the work he could out of it. As long as he was acting fair and straight with me I didn't care."

NEWMAN, NORTHRUP & LEVINSON, for appellant.

FOLLANSBEE & FOLLANSBEE, for appellee.

Mr. JUSTICE HAND delivered the opinion of the court:

It is first contended, the assignment to Mueller being in express violation of the terms of the contract, as against the university the assignment is void, and that Mueller is entitled to no relief by virtue of said assignment, as against the university, even in a court of equity. The contract between the university and Sammis in express terms provides that the contractor shall not sell,

assign, transfer or set over said contract, or any part thereof or interest therein, unto any person or persons whomsoever, without the consent, in writing, of the architects previously had and obtained thereto, and that an assignment or transfer of the contract without the written consent of the architects first had and obtained thereto shall be absolutely null and void; and no claim is made that the architects or the university consented, in writing, to the assignment made by Sammis to Mueller. The assignment relied upon not having been assented to, in writing, by the architects or the university, is such assignment null and void as to the university? The rule is laid down in volume 2 of the American and English Encyclopedia of Law, (2d ed. p. 1035,) that the parties to a contract may in terms prohibit its assignment, so that an assignee cannot succeed to any rights in the contract by virtue of the assignment thereof to him, and the rule thus announced is well supported by the authorities.

In *Arkansas Valley Smelting Co.* v. *Belden Mining Co.* 127 U. S. 379, the court say: "At the present day, no doubt, an agreement to pay money or to deliver goods may be assigned by the person to whom the money is to be paid or the goods are to be delivered, if there is nothing in the terms of the contract, whether by requiring something to be afterwards done by him or by some other stipulation, which manifests the intention of the parties that it shall not be assignable. But everyone has a right to select and determine with whom he will contract, and cannot have another person thrust upon him without his consent. In the familiar phrase of Lord Denman, 'You have the right to the benefit you anticipate from the character, credit and substance of the party with whom you contract.'"

In *Delaware County* v. *Diebold Safe and Lock Co.* 133 U. S. 473, it is said: "A contract to pay money may doubtless be assigned by the person to whom the money is payable, if there is nothing in the terms of the contract which

manifests the intention of the parties that it shall not be assignable. But when rights arising out of contract are coupled with obligations to be performed by the contractor, and involve such a relation of personal confidence that it must have been intended that the rights should be exercised and the obligations performed by him alone, the contract, including both his rights and his obligations, cannot be assigned without the consent of the other party to the original contract."

In *Burck* v. *Taylor*, 152 U. S. 635, the State of Texas made a contract with Schnell for the erection of its capitol building in accordance with certain plans and specifications, Schnell to furnish all the labor and do all the work for the consideration of the conveyance to him by the State of three million acres of land. The contract contained the following clause: "It is further agreed, covenanted and stipulated by the party of the second part that this contract shall not be assigned, in whole or in part, by the party of the second part without the consent, in writing, of the party of the first part, signed by the Governor of Texas and the capitol building commissioners, with the advice and consent of the heads of departments." In a suit between assignees it was held: "It is true that in the case at bar we have no construction of a statute, but only of the terms of a contract. That contract, however, was as binding on the one party as the other. The contractor assented to its terms precisely as did the State, and his promise was, not to assign the contract, in whole or in part, without the consent, in writing, of the State authorities. It was a promise which entered into and became one of the terms of the contract, and one which was binding not only upon the parties, but upon all others who sought to acquire rights in it. It may be conceded that, primarily, it was a provision intended, although not expressed, for the benefit of the State, and to protect it from interference by other parties in the performance of the contract, to

secure the constant and sole service of a contractor with whom the State was willing to deal, and to relieve itself from the annoyance of claims springing up, during or after the completion of the contract, in favor of parties of whose interests in the contract it had no previous knowledge and to the acquisition of whose interests it had not consented. Concede all this, and yet it remains true that it was a stipulation which was one of the terms of the contract and binding upon the contractor, and equally binding upon all who dealt with him. It is unnecessary to hold that the contractor might not be personally bound upon his promise, made before the performance of the contract, to transfer a portion of his profits to any third party. Whatever liabilities he might assume by such a promise, it would be an independent promise on his part and would not let the promisee into an interest in the contract. It would give him no right to take part in the work, no right to receive anything from the State, and all that it would give him would be an independent right of action against the contractor for the failure to pay that which he had promised to pay, the contract remaining all the time the property of the contractor, subject to disposal by and with the consent of the State. To him alone the State would remain under obligations and with him alone would the State be required to deal. In no way, by garnishment, injunction or otherwise, could the promisee prevent the State from carrying out the entire contract with the contractor, paying to him the whole consideration and receiving from him a full release."

In *City of Omaha* v. *Standard Oil Co.* 55 Neb. 337, the contract was between the city and the Metropolitan Street Lighting Company for the lighting by the company of certain streets, and contained this clause: "It is further agreed between the parties hereto that the party of the second part shall not assign this contract without first obtaining the consent of the first party, indorsed hereon in writing." The Standard Oil Company furnished the

lighting company the oil necessary to enable it to perform its contract with the city, and also loaned it considerable money, and the lighting company assigned to the oil company, as security, the money due under the former's contract for the month of October, 1892. The Standard Oil Company sued the city and recovered judgment, which was reversed on appeal. In disposing of the case the court say: "The inhibition, it will be noticed, is not alone upon the assignment of the obligation to light the streets, but upon the assignment of the contract. What was the contract between the parties? Certainly one of its important elements was the duty laid upon the city to make monthly payments to the lighting company for the services rendered; and another was the correlative right of the company to receive such payments. The assignment of the October installment, if valid, not only transferred to the plaintiff a right secured to the lighting company by the contract, but affected, as well, an important obligation on the part of the city. It compelled the city to deal with strangers, and to determine, at its peril, which of the contesting claimants was entitled to the fund. This may have been one of the very contingencies contemplated by the city and against which it sought to provide by making the contract non-assignable. Another object in view might have been to prevent the company from losing interest in the performance of the contract by divesting itself of all beneficial interest therein. But it is needless for us to speculate on the motives for the city's action. It is enough for us to know, whatever its reasons may have been, that it has in plain language stipulated against an assignment of the contract. That stipulation is valid and must be enforced. To hold that it covers some, but not all, of the rights and obligations arising out of the contract, would be, it seems to us, an inexcusable perversion of its terms."

In *LaRue* v. *Groezinger*, 84 Cal. 281, (18 Am. St. Rep. 179,) which was an action for damages for the breach of a con-

tract to buy grapes, the court, after discussing the California statute providing for the assignment of written contracts for the payment of money or delivery of personal property, say: "In the first place, it was not intended to render null any agreement that the parties may have made on the subject. Hence, if the contract itself provides, in terms, that it is not transferable, it certainly cannot be transferred, although it otherwise might be so. Leases, and the tickets usually issued by railroad companies, are familiar instances of this. Upon the same principle, although a contract may not expressly say that it is not transferable, yet if there are equivalent expressions, or language which excludes the idea of performance by another, it is not assignable. Of this character is the case of *Shultz* v. *Johnson*, 5 B. Mon. 497, which is much relied upon for the appellant. There the defendant agreed to buy from one Johnson successive crops of hemp 'of his own raising,' and it was held that the defendant could not be compelled to accept hemp raised by Johnson's administrator. The court said that 'the question * * * in every case must turn at last upon the intention of the parties,' and that the phrase 'of his own raising' meant that the hemp was to be raised by him or under his personal superintendence and direction."

If we assume, however, that the assignment of December 4, 1896, was valid, what is the legal effect thereof? We do not understand the appellant to contend that the assignment transferred to Mueller the contract in such manner that he had the right or could have been compelled to carry out the contract in all its terms, but that his position is that the assignment gave him the right to receive from the university the money to become due under the contract, as the same should accrue and be earned by Sammis,—in other words, that it was not an assignment of the contract, but only an assignment of the money which might thereafter accrue and become due thereon. The assignment was clearly not a transfer of all

of the money that was to accrue and become due thereafter upon the contract, as a considerable portion thereof was expressly reserved in the assignment by Sammis with which to pay material-men, sub-contractors and laborers, outside of Mueller. It was therefore, at most, only an assignment, in part, of the money which was to accrue and become due upon the contract thereafter. How was it to be determined what portion of the money had and what portion had not been assigned to Mueller? The assignment is silent upon that point. The work had not been commenced and nothing was due upon the contract at the time of the execution of the assignment. No method is pointed out therein whereby the amount that is going to Mueller or the amount that is to be retained by Sammis can be determined, and no provision is made in the assignment, in express terms, that Mueller is to collect and disburse the money as it accrued and became due. Sammis had the right to collect the money from the university, under the contract, prior to the time the assignment was made, and as he did not transfer, by the assignment, that right to Mueller, it remained in him. The assignment was prepared by the attorney of Mueller and must be taken most strongly against Mueller. If it had been intended that Mueller should collect the money directly from the university, the assignment would have certainly given him that power in express terms. We think, therefore, upon the face of the assignment alone, Sammis had the right to collect the money from the university as it accrued and became due, and to pay the material-men, sub-contractors and laborers, other than Mueller, out of the amount collected, and that the only right that Mueller acquired by virtue of the assignment, was to receive the balance from Sammis remaining in his hands from the amounts collected by him from the university after he had paid the material-men, sub-contractors and laborers provided to be paid by the assignment. This construction is the one put upon the assignment

by the parties themselves, as shown by their course of business and the correspondence of Mueller found in this record. Where the construction of an instrument in writing is doubtful, and the parties thereto have given a construction to it by acting upon it in a certain manner, courts will usually adopt and follow the construction of the instrument which has been adopted by the parties. Neither is this construction a strained or unnatural one. The assignment was intended only as a security. At the time and for many months after the assignment was executed Mueller had confidence in Sammis. Sammis was in Chicago where the work was being done, where the architects' certificates would be issued and the money paid, while Mueller was in Cincinnati. Sammis could readily collect the money, pay the local claims and remit the balance to Mueller. This could not be done by Mueller without going to Chicago. Up to about the time the building was completed Mueller undoubtedly believed Sammis would carry out the assignment in good faith and turn over to him what remained in his hands after the payment of the claims provided to be paid to parties other than Mueller by the terms of the assignment, and made no effort to collect the same himself. If the assignment is to be so construed,—and we are fully convinced such is the correct construction thereof,—then the sums paid to Sammis by the university were rightfully paid to him, and the fact that he subsequently violated his trust and refused to account to Mueller will not authorize Mueller to collect the money a second time from the university and after it has rightfully been paid to Sammis. In any event, we think the evidence clearly shows that there was an understanding between Mueller and Sammis that Sammis should collect from the university the money on said contract as it became due and payable, and after paying the material-men, sub-contractors and laborers in Chicago therefrom, turn over the balance to Mueller. Whether they reached such understanding from

the terms of the assignment or by virtue of a subsequent parol agreement, as testified to by Sammis, is wholly immaterial. That Sammis collected the money due upon said contract from the university with Mueller's consent we have no question.

The appellant urges that the provision in the contract that it shall not be assigned "without the consent, in writing, of the architects previously had and obtained thereto," was waived, and that by the conduct of the university and its agents it has estopped itself to insist that the assignment is null and void. We have no question that such provision, being for the benefit of the university, could be waived by it or that by its conduct it might estop itself from insisting thereon. We, however, find nothing in this record which can be construed into a waiver of such provision or into an estoppel as against the university, so as to make it liable to pay to Mueller more than the balance found to be due upon the contract with Sammis. The notice to D. H. Burnham & Co. of the assignment, contained in Mueller's letter of December 11, 1896, is vague and uncertain, and gave them but little information as to the transaction between Mueller and Sammis. If, however, they had followed up such notice and made inquiry of Mueller and Sammis, the only parties who knew what the real arrangement between Mueller and Sammis was, all they would have learned would have been the fact that Sammis retained the right to receive the money from the university upon the contract as it accrued and became due, and that he was to account to Mueller for the balance remaining in his hands after the material-men, sub-contractors and laborers in Chicago had been paid. Such information would not have made the university an insurer that Sammis would carry out such arrangement in good faith with Mueller, or made it liable to Mueller in case Sammis converted to his own use such balance instead of paying the same to Mueller, or estopped it from showing, in defense of this cross-

bill, that it paid to Sammis the various sums which he received under said contract, and that he had the right to receive the same.

It is claimed the university should have been required to pay interest on the balance due Sammis. It withheld the balance at the request of Mueller. The amount so withheld was claimed by each of the defendants to the bill of interpleader. The delay in payment, if any, was caused thereby, and through no fault of the university. There was no unreasonable and vexatious delay of payment on its part, and it should not be required to pay interest on said balance.

We find no reversible error in this record. The judgment of the Appellate Court will therefore be affirmed.

*Judgment affirmed.*