F. E. GILBERT *v.* NORFOLK & WESTERN RAILWAY COMPANY *et al.*

(No. 7634)

Submitted November 1, 1933. Decided November 21, 1933.

*Kenneth C. Patty,* for appellant.
*A. J. Lubliner* and *John Kee,* for appellee.

KENNA, JUDGE:

William C. Mays, at the time being a retired and pensioned railway engineer of the Norfolk & Western Railway Company residing in the city of Bluefield, prior to the 15th day of December, 1930, made application to F. E. Gilbert of that city for a loan of $2,500.00. As security for the loan, Mays offered to assign to Gilbert a death benefit policy in the railway company's pension and relief fund department in the sum of $2,500.00 and a pension which he had theretofore been receiving and was thereafter to be entitled to receive during his life in the amount of $45.91 per month, after deducting therefrom the monthly payment necessary to keep the $2,500.00

death benefit policy in effect. The proceeds of the loan were to be applied in the first instance to taking up a loan secured by the same collateral owed by Mays to Savings & Loan Corporation of Roanoke, Virginia, for which one C. D. Fox, Jr., was acting as trustee. In addition to the actual property pledged, Mays offered to execute a power of attorney to Gilbert's trustee which would authorize the attorney in fact to draw the monthly pension checks, indorse them, and apply the proceeds upon the loan to be made. This course had been followed in securing the loan made by Fox to Mays. In the course of the investigation preliminary to making the loan to Mays, Gilbert took the matter up by letter with J. C. Snavely, who was in charge of the relief and pension department of the Norfolk & Western Railway Company. On December 15, 1930, Snavely wrote a letter to L. C. Fowlkes, who was at the time acting for Mays, by which he advised that, acting under instructions from Mays, in the event Gilbert made the loan and took up the Fox loan owed by Mays, then the railway company would mail the pension checks monthly to Fowlkes to be applied upon the Gilbert loan, and, further, that if Mays should die before he paid the loan the $2,500.00 death benefit would be paid to Fowlkes as trustee. Gilbert loaned the money to Mays on the strength of the security thus offered and on the faith of the arrangement agreed upon as the method of putting that security back of the loan. The assignments were duly made by Mays, the power of attorney to L. C. Fowlkes was duly executed and Fowlkes was duly substituted as Mays' beneficiary in the death benefit policy. Upon the loan going through, the debt owed by Mays to Fox was duly paid and the balance of the $2,500.00 advanced by Gilbert was paid over to Mays. On July 23, 1931, Mays undertook to revoke the power of attorney and the assignments and demanded that the railway company make the monthly payments of the pension to him. Upon this demand, the railway company simply suspended the monthly payments, not making them either to L. C. Fowlkes or to Mays. Mays then instituted an action in the circuit court of Tazewell County, Virginia, against the Norfolk & Western Railway Company, the purpose of which was to compel payment of the monthly payment of the pension to himself. The railway

company does not seem to have defended this action, and yet there is no proof of a judgment having been rendered therein. The railway company seems to have agreed, however, to send the monthly checks to Mays, which it did for a time. In the meantime, and in July or August, 1931, Mays had filed his voluntary petition in bankruptcy, and in the schedules had listed both the amount of the pension and the death benefit as worthless assets. Gilbert appeared in the bankruptcy proceeding, filed his claim and by petition asserted a lien upon both the pension and the death benefit policy. This petition prays that the death benefit policy be not administered by the trustee in bankruptcy because of it being a cumbersome and worthless asset. It does not specifically make the same prayer concerning the pension payments. The bankruptcy proceeding proceeded to a discharge of Mays, the trustee specifically electing not to administer the death benefit policy and reporting that there were no assets of the estate. Although he did not specifically state in his report that he did not elect to administer the pension, his report that there were no assets of the estate and his subsequent conduct in not administering the pension fund payments, indicate quite clearly that it was the purpose of the trustee not to administer the pension as an asset. This suit was brought later in the circuit court of Mercer County for the purpose of enjoining the railroad company from paying over the pension checks to Mays and to require that they be paid to Gilbert under his contract. From a decree in favor of Gilbert, Mays prosecutes this appeal.

Consistent with the general rule that a private business corporation is carried on primarily for the profit of its stockholders and that therefore its charter powers and those of its board of directors, must be exercised for that purpose, it has, nevertheless, been generally held that such corporations may, for the ultimate benefit of the corporation itself translated into profit, use the funds of such corporation for purposes which might appear directly to be charitable and humanitarian. It has been held that private corporations may take proper steps to insure adequate housing, school facilities and churches; that they may supply medical attention for their employees, defray the expenses of taking care of injured employees, maintain benefit funds for sick and injured employees and per-

form a variety of other acts which, upon their face, yield no direct return or benefit to the corporation and are in the nature of humanitarian grants to the employee. Without citing specific cases to maintain this general assertion, reference may be had for that purpose to the annotation following the case of *Dodge* v. *Ford Motor Company*, 204 Mich. 459, 170 N. W. 668, 3 A. L. R. 443 (case at page 413). The creation of pension funds for corporations has been uniformly sustained in the few cases in which the question of their validity has arisen. *Heinz* v. *National Bank*, 150 C. C. A. 592, 237 Fed. 942. The courts have gone further than to sustain the mere creation of a pension fund on the part of private business corporations, and have held that when created, the existence of such fund and of the regulations for its administration adopted by the corporation, constitutes an offer on the part of the corporation to those engaging in its service which, when accepted by the entrance of persons into the service of the corporation or by remaining in the service of the corporation (such fund and regulations being in existence at the time), gives rise to a contractual relationship which may ripen into vested rights in the employee. *Heinz* v. *National Bank of Commerce*, 237 Fed. 942, 150 C. C. A. 592. The same is true with reference to the offering of bonuses by corporations to their employees. *Kerbaugh, Inc.* v. *Gray* (C. C. A. 2d Cir.), 212 Fed. 716; *Haag* v. *Rogers*, 9 Ga. App. 650, 72 S. E. 46; *Scott* v. *Duthie & Co.*, 125 Wash. 470, 216 P. 853, 28 A. L. R. 328, and note.

The principles upon which the holdings before referred to are based, would seem quite clearly to distinguish the right of the employee to participate in a pension fund, from the right of the employee to participate in future wages. In the case of the pension fund, the employee has a contractual relationship with the employer from the beginning of the employment. An offer is held out to him from the beginning and continuing throughout the employment of a certain part of the pension fund that he will be entitled to when he has reached a certain status based upon the duration and satisfactoriness of his service. When he brings himself within the terms of the offer by acquiring the defined status, the right to participate in the pension fund under the terms of the offer vests in the employee. He has earned it by complying with the terms of the

offer and fulfilling his part of the contract of employment to that end. His right to it is irrevocable to the extent of his pro rata share of the fund set apart for the fulfillment of the purpose as to him and others entitled thereto. On the other hand, the matter of future wages contains no element of such a settled contractual relationship. Distinguishing instances of wages or salary earned during specific terms of employment established by contract (see 2 R. C. L., sec. 12, p. 603), wages earned from month to month have no existence until the service has been rendered. There is no settled contractual relationship in the present out of which they are to grow in the future. Such is not the case with the pension fund.

Having seen that the pension fund brings about a contractual relationship between the employer and the employee which ripens into vested rights in the employee when he acquires the status of a pensioner, we conclude that the rights vested in the employee after having acquired that status, because contractual, fall within the general rule to the effect that contractual rights, not involving liabilities to be discharged, purely personal services to be performed nor relationship of trust and confidence, are assignable unless some reason to the contrary appears. *Smelting Co.* v. *Mining Co.*, 127 U. S. 379; *Poling* v. *Boom & Lumber Co.*, 55 W. Va. 529, 536, 47 S. E. 279; *Standard Sewing Machine Co.* v. *Smith*, 51 Mont. 245, 152 P. 38; L. R. A. 1918A, 292. Here the contract was fully performed on the part of Mays and nothing remained to be done by the company save to pay the pension.

But the pension regulations of the company expressly provide that the pension shall not be assignable. This was not made known to Gilbert when he made his inquiry of the head of the pension department of the company.

A provision against assignability is valid and enforceable. The provision here, however, is not to be confused with like provisions in life and other insurance policies where considerations based upon insurable interest, or the lack of it, have caused the courts to decide the question of assignability on the basis of public policy, regardless of questions of waiver and estoppel in so far as the parties directly affected are concerned. Here, we have a provision against the assignment of the pension made a part of the regulations for the administration

of the pension fund prescribed by the railroad company. The provision in question is as follows: "11. In order to preserve direct personal relations between the company and its retired employees, and that they may continue to enjoy the benefits of the pension system, no assignment of pensions will be permitted or recognized; nor shall any pension allowance be liable to attachment or other legal process for debts of the beneficiary." This provision is imposed by the railroad company in order to put into effect its own ideas of how the pension fund should operate. It is to be remembered that the creation of the fund itself by a corporation organized for the primary purpose of profit to its shareholders, receives legal sanction on the theory that such establishment indirectly redounds to the profit-making good of the corporation by creating an interest in long and efficient service on the part of its employees. It would seem that the regulations, which, to the mind of the railroad company, are best calculated to carry out the purposes of this fund are imposed in the interest of the railroad company. The fact that the interests of the employees may also be best served thereby does not detract from the principal assertion. This brings us to the legal proposition that contractual stipulations against assignability may be waived by the parties to the contract and more particularly by that party for whose benefit the stipulation is inserted into the contract. There is abundant authority for this principle. *Staples* v. *City of Sommerville*, 176 Mass. 237, 57 N. E. 380; *Mueller* v. *Northwestern University*, 195 Ill. 236, 63 N. E. 110, 88 Am. St. Rep. 194, and note. The facts in this case show that the lender, Gilbert, did not rely alone upon the admitted fact that a pre-existing loan from Fox had been secured, with the acquiescence and consent of the railroad company, in exactly the way that Gilbert proposed to secure the loan that he was to make to Mays. Standing alone, under the circumstances of this case, the fact that Gilbert knew of this pre-existing loan and the detail of the method by which it had been secured, might have been sufficient to estop the company and protect Gilbert. But Gilbert went further. Not only did he have the conduct of the railway company in the Fox loan to give him assurance of the railway company's consent and cooperation in protecting his collateral, but upon

express inquiry from Gilbert addressed to the very department of the railway company having this matter in its direct charge, he received a detailed statement of what the railway company would do at the request of Mays, which it had already received, in the event that Gilbert made the loan. He immediately made the loan in obvious reliance upon these assurances. Can either Mays or the railway company now be heard to say that the benefits accruing to Mays from this pension fund contract are not assignable? As far as their individual positions are concerned, it is perfectly clear that it would be inequitable under the circumstances to permit either to raise the question. Neither do we think that there is any question of public policy involved in such contract as would cause us to hold them unassignable per se, ignoring the stipulations and conduct of the parties. It is therefore our opinion that this contract is assignable, that the provision against its assignability, although valid and enforceable, was waived, and that Gilbert at the time of the bankruptcy of Mays held a valid assignment as collateral security for his loan of $2,500.00, less credits existing at that time.

Enough has already been stated herein, we believe, to show that although the bankruptcy proceeding, in so far as this pension fund benefit is concerned, was irregularly conducted, doubtless due to the fact that it was thought the insurance and pension fund benefit sprung from the same contractual undertaking and would go through the bankruptcy proceeding as a single asset, that nevertheless it substantially appears that the trustee in bankruptcy elected to treat the pension fund benefit as a cumbersome and useless asset not to be administered. It was subject to the Gilbert loan. It was not reported as an asset by the trustee. It was set up in the schedule of Mays as a burdensome and useless asset. It was not sold or otherwise administered. If possible, the proceeding in bankruptcy should be treated as having considered and disposed of it in some way. It seems to us that the only consistent way to so treat it is by carrying out the manifest intent of the trustee as it appears from that much of the bankruptcy proceeding as is before us in this case. We think that his purpose not to administer the pension fund as an asset of the estate substantially appears. *Dushane* v. *Beall*, 161 U. S. 513,

516, 40 L. Ed. 791; *Sparhawk* v. *Yerkes,* 142 U. S. 3, 35 L. Ed. 915; *First National Bank of Jacksboro* v. *Lasater,* 196 U. S. 115, 49 L. Ed. 408; Remington on Bankruptcy, sec. 1156, Vol. II, p. 496, *et seq.*  Since Mays had a valid and subsisting lien upon this fund created more than four months prior to the bankruptcy proceeding that lien would have been taken into consideration had the fund been administered in the bankruptcy proceeding; and since it was not, the lien of Gilbert still attaches and this without regard to whether the personal responsibility of Mays for the debt to Gilbert has been discharged by his bankruptcy.  *Long* v. *Bullard,* 117 U. S. 617; *Bassett* v. *Thackara,* 72 N. J. L. 81, 60 Atl. 39; Remington on Bankruptcy (3rd Ed.), sec. 449, Vol. 7, p. 454.

Since we see no irregularity or error in the decree of the trial chancellor giving Gilbert the benefit of his assignment of the pension fund from Mays, it follows that the assignments of error, which will not be dealt with in detail, are insufficient for reversal.  The decree of the trial chancellor will therefore be affirmed.

*Affirmed.*