Retirement Board of Allegheny County *v.* McGovern et al., Commissioners, Appellants.

Argued April 23, 1934.   Before Frazer, C. J., Simp-
son, Kephart, Schaffer, Maxey, Drew and Linn, JJ.

*John H. Lauer,* with him *J. P. Fife,* for appellants.

*A. W. Powell,* for appellee.

OPINION BY MR. JUSTICE KEPHART, June 30, 1934:

This appeal challenges the Retirement Act for employees of counties of the second class. On the application of the Retirement Board of Allegheny County the court below directed the commissioners to draw and sign a warrant in the sum of $75,000 payable to the treasurer of the retirement board. The order was made pursuant to the Retirement Act of May 2, 1929, P. L. 1278, which provides that the commissioners "shall annually, in January, appropriate and pay into the Pension Fund not less than one-half [½] of one [1%] per cent and not more than two [2%] per cent of all available moneys received by the County as taxes during the preceding calendar year."

The commissioners on March 3, 1933, appropriated the sum of $75,000, and later, on August 22, 1933, two of the commissioners voted to rescind the resolution authorizing the appropriation because it was "illegal and unconstitutional." The majority of the retirement board, consisting of one county commissioner, the treasurer, controller, and two persons elected from the system, instituted mandamus to compel the payment of this sum of money. In the return of the two remaining commissioners, the successive Retirement Acts were challenged as unconstitutional in that they violate the following provisions of the Constitution: Article I, section 17; Article III, section 3, section 7, section 11, section 13, section 17, section 20;[1] the return also sets up gross neglect in the administration of the fund, its unsound and ruinous actuarial practices, its insolvency, and the confiscatory nature of the retirement pay to public officers illegally placed on the pension roll.

The return to the petition not only challenges the Retirement Act for second class counties, but its constitutional objections, if sound, would sweep away the re-

---

[1] These provisions will be taken up and discussed individually *post.*

tirement pay of all employees under retirement acts, whether for school teachers, city, county or state employees, if there is a contribution to the retirement fund reserves by any governmental body. The return is a sweeping arraignment of this highly beneficent measure designed to aid employees who have served a long period of time in public employment and have reached an age where through decreased earning power because of impairment of mental or bodily vigor, they are compelled to separate themselves from active service. The objections were made in good faith.

The enactment of retirement laws comes under the general power of the assembly to legislate on matters which are not interdicted by the Constitution.[2] See Com. ex rel. v. Reeder, 171 Pa. 505, 513; also Tranter v. Allegheny County Authority, 316 Pa. 65. It is the sole judge as to laws that are in the interests of the public

---

[2] We note, and with special reference to article III, section 20, that at the time of the adoption of the Constitution there were few instances of retirement pay to employees advanced in years. The practice had not become a factor in the social sphere. Gradually the necessity for providing compensation to employees who are unable to carry on with the vigor of younger days, became more and more apparent and many years ago great industries and railroads instituted systems of retirement compensation for their employees, so that for more than 30 years retirement pay has been a not uncommon thing with them. The states and municipal governments, realizing that something should be done to ameliorate the conditions of their employees who were serving in nonelective positions, also adopted the retirement system, later reaching out to include those elective officers who had continued in the service of the government for the same period of time as employees, and provided retirement pay for those who were incapacitated from age or other disability, or whose term of service or other cause forced a separation from government employ. The merit of this system cannot be doubted: persons reaching a given age who have been long in the service of the government, an age at which no other useful employment is open to them, should be protected and cared for by the governmental agency in whose behalf they have so long labored.

and have a tendency to procure for its people more competent and better performed public service.

The origin of retirement pay in cities of the second class was the Act of May 11, 1915, P. L. 285. It was repealed and a new retirement system was created by the Act of May 8, 1919, P. L. 138; this was reënacted by the Act of May 2, 1929, P. L. 1278. The Act of 1929, P. L. 93, authorizes the employees of the poor district of Allegheny County to join this system. This is followed by the Act of 1933, P. L. 840, sections 311 to 327, inclusive, which amended the Act of 1929, P. L. 1278.[3] The title of the Act of May 2, 1929, is "An act relating to counties of the second, third,......class, revising amending and consolidating the laws relating thereto." The article relating to the retirement of employees is article III, and is contained in sections 311 to 326, inclusive.

This title is assailed under article III, section 3, which provides that "No bill shall be passed containing more than one subject, which subject shall be clearly expressed in its title." Two subjects of legislation cannot be set up in one statute: Com. v. Humphrey, 288 Pa. 280. But we have frequently held that the title to an act need name only the real subject of the legislation, and that it need not index all the subdivisions thereof, nor any matters that may be fairly related to it. The act is entitled a general county law. The subject is designated with clearness and is sufficient to put one on inquiry into the body of the act concerning any matter or thing relating to county government. This would include any relevant subject which, prior to the enactment of the general county law, had been legislatively consid-

---

[3] We omit setting forth in full either the titles or the relevant parts of the acts because of their length. The reader is referred to the acts themselves, where a comparison can be made of the provisions for the retirement of teachers, state employees and other city and county officials: See Acts of June 27, 1923, P. L. 858 (state); Act of May 20, 1915, P. L. 566 (cities of first class); Act of July 18, 1917, P. L. 1043 (teachers).

ered as part of the government of counties and all extensions thereof normally developed therefrom. See Com. v. Snyder, 279 Pa. 234, as to the Administrative Code; Com. v. Macelwee, 294 Pa. 569, as to the Township Act; Orlosky v. Haskell, 304 Pa. 57, as to Vehicle Codes; Constitutional Defense League v. Waters, 309 Pa. 545.

The particular objection is to the clause requiring this appropriation to be made. It is argued that while the act gives notice that the county commissioners are authorized to appropriate, the real matter with the section is that instead of the words "they may appropriate," the act requires that they "shall," and it is for this reason the mandamus was issued. Standing alone this would be insufficient to defeat the statute; not infrequently "may" has been taken to mean "shall," and "shall" has been taken to mean "may." There is, however, no "may" in this act regarding the subject; the establishment of the fund and the payments thereto by the county and its employees are all mandatory.

It is contended that the title to the act did not indicate that any duties were imposed upon the county commissioners, controller and treasurer or that the county would have to pay the expenses of the retirement board. As indicated above, these specific objections are covered by the inclusive subject-matter of the act, and as the legislation imposing these duties and these expenses had been in existence many years prior to 1929, the objection should have no weight in determining the legal sufficiency of the title.

Article III, section 34, answers the objection that this is a local or special law under section 7. The former reads: "The Legislature shall have power to classify counties, cities, boroughs, school districts and townships, acording to population, and all laws passed relating to each class,......shall be deemed to be general legislation." Legislation affecting counties of the second class must be considered, under this section, general legisla-

tion, notwithstanding what might have been said in our prior cases under section 7. See Justice LINN'S opinion in Tranter v. Allegheny County Authority, supra; also Sambor v. Hadley, 291 Pa. 395, 406; Com. v. Wert, 282 Pa. 575, 581. The amendment further validated "all laws passed" with reference to the classification of these municipalities. This disposes of the contention that any of the acts are special or local legislation. Whether this legislation has such a result as to Allegheny County to the exclusion of other counties is of no consequence under section 34.

Article I, section 17, provides that "No ex post facto law, nor any law impairing the obligations of contracts ......shall be passed," as well as article I, section 10, of the federal Constitution. Appellants contend both articles are breached. Ordinarily, ex post facto laws apply to criminal and not civil matters: Grim v. Weissenberg School Dist., 57 Pa. 433, 435; Stoddart v. Smith, 5 Binney 355, 363. The requirement that employees contribute a part of their salary to the retirement fund does not impair the obligation of their contract. There is no contract for the permanency of the salary of employees. See Com. v. Bacon, 6 S. & R. 322. Then, too, the employees do not raise the question. See Com. v. Haldeman, 288 Pa. 81.

Another complaint under article III, section 7,[4] relates to the immunity from execution of the retirement pay that may be due to the members. This is not unusual: Irving Bank v. Alexander, 280 Pa. 466; the exemption does not make the act unconstitutional. The section does not grant any special privilege or immunity not heretofore recognized as proper.

Article III, section 11, provides: "No bill shall be passed giving any extra compensation to any public offi-

---

[4] "The General Assembly shall not pass any local or special law ......granting to any corporation, association or individual any special or exclusive privilege or immunity."

cer, servant, employee......after services have been ren-
dered." This section should be read in connection with
sections 13 and 17 of the same article. Under the Sec-
ond Class County Act all employees receiving wages or
salary were placed on the retirement register by the
board on the effective date of the act. From that time
payments were made by them until they satisfied the re-
tirement or superannuation requirements. They were
then eligible to retire and receive the retirement pay
mentioned in the act, although no contributions had
been made by them for years of service prior to the effec-
tive date of the act. Many of these employees, from serv-
ice and age, were entitled to and did retire shortly after
the act's effective date by making but few payments as
members of the system.[5] The act required the county to
make a contribution which presumptively would take
care of the necessary reserve for future payments for
these employees. It is now contended that the receipt
of this full retired pay by such employees, not being
based in its entirety on adequate present service after
the effective date of the act, is, in reality, extra compen-
sation for past services rendered, because of such con-
tributions by the county.[6] We said in Busser v. Snyder,
282 Pa. 440, 454, that the basis of retirement pay is nei-
ther charitable nor benevolent, but is the faithful, valu-
able service actually rendered over a long period of
years. Retirement Acts, affecting many employees and
officers, had been passed before the services were ren-

---

[5] Respondents aver that, as of September 30, 1933, 23 employees
who retired between April 30, 1916, and August 31, 1924, have been
paid $275,341.76 whereas their total contributions to the fund
amounted to only $2,248.92, less than 1% of amounts thus far paid
them. Of 15 who have each been paid from $10,000 to $20,000 in
pensions none contributed more than $243.85 to the fund.

[6] It may be here stated, there is no allocation of the State's or
county's contribution on the basis of future reserve between that
necessary for a member's service or contribution prior to the effec-
tive date, and that necessary for the State's or county's share after
the effective date.

dered, and the appropriations made, therefore, were for this "delayed compensation for these years of service actually given in the performance of public duties in their respective capacities." These benefits under the Retirement Acts, as to elective constitutional officers, were, in effect, part of their salaries.

It is also urged that these payments are, and the present act in fact provides for, pensions, if the payments are not made for past services. Pensions should not be confused with retired pay. A pension is a bounty or a gratuity given for services that were rendered in the past. This act provides for retirement pay. Retirement pay is defined as "adjusted compensation" presently earned, which, with contributions from employees, is payable in the future. The compensation is earned in the present, payable in the future to an employee, provided he possesses the qualifications required by the act, and complies with the terms, conditions, and regulations imposed on the receipt of retirement pay. Until an employee has earned his retirement pay, or until the time arrives when he may retire, his retirement pay is but an inchoate right; but when the conditions are satisfied, at that time retirement pay becomes a vested right of which the person entitled thereto cannot be deprived: it has ripened into a full contractual obligation. See Lynch v. U. S. (U. S. Supreme Court), decided June 4, 1934. True, section 312 of the Act of 1929 calls this system a "pension system" and the fund a "pension fund," but in every part of the statute the system and fund created are of the character above described and the nomenclature has been changed to "retirement system" and "retirement fund" by the Act of May 22, 1933, P. L. 840.

The distinction between pension and retirement pay is not artificial. The government and municipalities are interested in the faithful and effective discharge of duty by public servants, and a fund judiciously administered is an effective way to secure service of the highest type.

Where an allowance is made out of hand, gratuitously, and purely for past services, by the government, it is a pension, with all the attributes of a pension; but where the employee contributes a part of his salary or wages with a sum from the State or county under a quasi contractual relationship with the municipality or State, creating a contributed reserve retirement system, the results are different, retirement pay made therefrom is not a pension:[7] the contributions by the government, from their very nature, must be viewed in a different light.

The answer to the constitutional objection as to extra payment to such employees is threefold. First, prior to the present retirement system, there were other acts in existence providing for delayed compensation in the form of retirement pay. This is true in many instances in connection with the state system and in all such cases the potential reserve set up by the government or its agencies for this compensation under the earlier plans must be considered as applicable to the retirement pay in its new form under the present plan. To illustrate: consider the Retirement Acts relating to judges.[8] When,

---

[7] The opinion of the federal Supreme Court, Lynch v. U. S., decided June 4, 1934, describes the difference between War Risk Insurance and a pension, the former having the incidents of a contract (as retirement pay does here). The insurance fund is made up of contributions by the government and the member, the government paying the entire cost of administration. These engagements are held to be contracts.

[8] Act of May 11, 1901, P. L. 165, the genesis of the judges' retirement system, merely provided for the retirement, at the instance of the governor, of judges who by reason of physical or mental disability were incapacitated. Act of June 23, 1911, P. L. 1121, first granted judges retirement privileges contingent on certain factors such as term of service, age, and the willingness to perform certain duties if called upon. Act of June 5, 1917, P. L. 333, and Act of June 12, 1919, P. L. 461, in effect altered the requirements and extended the scope of the prior acts by granting similar privileges to county and municipal judges. Act of April 26, 1929, P. L. 844, section 4, repealed the Act of 1919, supra, except as to those retired

to bring all employees under one general retirement system, the inducement was offered to judges and other public officers elected under the Constitution to join the employees' retirement system and give up their rights to certain retirement compensation, the right they possessed under the Acts of 1911 and 1919 was vested. This vested right was part of their salaries as constitutional officers (Busser v. Snyder, supra) ; and it was, in the case of a judge joining the employees' retirement system, carried over and made part of the state employees' retirement system. This vested right to annual payments, presently capitalized, added value to the system's necessary reserve funds. It was that member's then present contribution to the retirement fund just as though he and the State had contributed it year by year for the years of required service under the retirement system. It was the equivalent of a personal contribution by that member during his entire term of service. The consideration for the transfer from these officials was potentially more than adequate. What we have said here as to such constitutional officers is the same as to other employees and officers not in that class, where prior acts were in existence at the time of the passage of the existent Retirement Acts[9] to the extent that might have been pro-

or entitled to retire under it prior to January 2, 1930, and as to judges commencing their term prior to that date, who do not join the State's retirement association.

[9] As to teachers: Under the Act of 1905, P. L. 267, section 6, a large number of district retirement funds were organized, which, under the Act of July 18, 1917, P. L. 1043, creating the state system, were, upon application of two-thirds of all the members of each, absorbed by the state system.

As to state employees: Prior acts were those of June 14, 1915, P. L. 973, as amended by Act of June 7, 1917, P. L. 559 (both operative only in the case of permanent disability), and Act of April 20, 1921, P. L. 197, all of which were repealed by the Act of May 24, 1923, P. L. 436, which permitted the governor to retire employees in certain contingencies. The present system was set up by the Act of June 27, 1923, P. L. 858, which saved certain rights under the former acts: see section 20.

vided by such acts. These other instances may not be as strong as the illustration given, but they are sufficiently similar to be analogous and answer the constitutional objection as to such employees.

Second, we have indicated in our short history (see note 2, supra), that the systems of pensions, where they were permissible, with retirement pay as here involved, have been created within the past 40 years. To effect a beginning and to obtain the desired result, there must be some date when the system will start and contributions begin. A given year, a fixed, definite day was usually selected. Membership and retirement were in most cases compulsory.

To require all employees of a city, county and state to contribute for the entire length of time they were in service prior to the effective date of the act would be subversive of the proper purposes of the legislative undertaking. The mass of such employees is usually of those receiving small wages and would generally be unable to make such payment. As a result, the State here required the municipality to contribute a given sum to the board for a future reserve for retirement pay. This appropriation is not to an individual as such, but it is an appropriation to a fund, a part of which the particular employee may or may not receive. With this in view no member of the system or association is in a position to complain about the lack of contribution from other employees for years prior to the act's effective date. Then, too, there is no legislative prohibition against the amount of the salary that shall be paid to such employee, or when it shall be paid, or the amount of adjusted compensation then to be provided for and paid in the future. This compensation may depend on a long or short service after the effective date of the Retirement Act, as the legislature sees fit.

Third, as it was viewed by other courts in determining the constitutionality of like systems under similar articles, such delayed compensation may be considered as

an inducement for the experienced employee and others to remain in the employ of the government.[10]

Allegheny County Retirement Fund was created under the Act of 1915; it was later amended, then repealed and reënacted, and again amended. As stated, these changes did not abolish the system but kept alive the basic plan of retirement pay. The record shows there are some 15 out of a possible 2,500 employees starting back in 1916 and running on through, who are now receiving retirement pay and who have contributed relatively small amounts for such compensation. However, the retirement acts are based on the theory of an adjusted compensation for time and service, payable in the future, provided the employee serves the required length of time and reaches the required age. We therefore hold that the Allegheny County Retirement Act did not breach these sections of article III of the Constitution.

Article III, section 20, provides: "The General Assembly shall not delegate to any special commission, private corporation or association any power to make, supervise or interfere with any......money, property, ......or to perform any municipal function whatever." It is charged, under this provision, that, inasmuch as the county is required to contribute a certain amount of money to this board, it is a supervision or interference with the money and property of the county; also that the act requires the surrender of delegated municipal functions to a board. This section is akin to article IX, section 7, which denies to any county the right to appropriate money to any association or individual. This question has been definitely answered by Com. v. Walton, 182 Pa. 373, and Com. v. Barker, 211 Pa. 610, both

---

[10] Fellows v. Connolly, 193 Mich. 499, 160 N. W. 581 (1916); State v. Love, 89 Neb. 149, 131 N. W. 196 (1911); State v. Levitan, 181 Wis. 326, 193 N. W. 499 (1923); State v. Blied, 188 Wis. 442, 206 N. W. 213 (1925).

Pennie v. Reis, 80 Calif. 266, 22 Pac. 176 (1889), without discussion, holds pensions are not "extra compensation."

of which have had direct bearing on, and have upheld, the retirement pay or even pensions of municipal officers under similar acts.

Appellants urge that the act is in violation of the XIVth Amendment of the federal Constitution, as well as similar provisions of our own Constitution. The commissioners' return, in their own behalf and as trustees for employee members, attacks the act in an important particular: it is alleged that the fund is insolvent and if the county and the employees are compelled by law to contribute to a fund which, through retirement requirements, will disappear or be injuriously affected, such compulsion is the taking of property without due process, and, in effect, works confiscation.[11]

It is no doubt true that if the retirement funds are insolvent or will become insolvent because of actuarial unsoundness, or if the contributions by the employees, or the results expected, are prejudiced by retirement payments, and the employees' property will or may be consumed, so that there will be no funds with which to make retirement payments, a very serious question arises; to answer it the controlling principles should be clearly set forth.

---

[11] Twenty-three members retired between April 30, 1916, and July 31, 1924, that is, within eight years of the system's start, having contributed but $2,248.92, and have been paid to September 30, 1933, $275,341.76, approximately $12,000 each. Under the pleadings it is further indicated that the county failed to contribute up to 1924 approximately $69,500 of the minimum amount required by law to be paid by it into the reserve fund, and, of course, did not pay any of approximately $753,000 the maximum which it was authorized to contribute, if necessary to sustain the fund on a sound basis. It is averred that the present value of the total liabilities for retirement payments as of December 1, 1933, aggregated over $7,250,000; that the necessary annual contributions to meet normally accruing liability is $480,000; while the present value of the funds on hand and accruing payments due, lack approximately $4,-500,000 of the amount required, and the annual contributions are short by $235,000.

The charge of insolvency, when dependent on actuarial matters, presents a factual situation which may be controlled by the legislature. As to this objection, urged by appellants, that the retirement fund is insolvent, and, therefore, the mandamus requiring the additional $75,000 to be paid into it should be reversed, it may be said that it is quite possible, as appellee contends, that the insolvency, if it exists, is due to the failure of appellants' predecessors in office to make the annual payments required by the statute; but the objection is unavailing in any event. The legislature had and has the absolute right to require the county, the state's subordinate agency, to help support the fund out of moneys over which the state had absolute control; and the commissioners cannot be heard to excuse their disobedience by saying the state's action was economically a mistake: in effect, to assure the insolvency upon which they attempt to base their excuse. This being a state matter, explicitly commanded, it can only be changed by action of the state, that is, by a legislative amendment, or by a decree of court on proceedings instituted by or on behalf of the state itself. To allow an agent to refuse to expend a fund of the principal as it directs, solely because the agent, or one employed by it, does not agree with the principal, would reverse all legal concepts—in this case it would make the sovereign subordinate to its subordinates.

But underlying all retirement systems of the class we are now discussing, is the legislative object, as well as that of the member employee, that a substantial reserve be built up so that the actuarial soundness of the plan cannot be questioned. This factor is an important one in the relation between state, city and county, as employer, and the employee member, with respect to retirement pay. If a direct attack on it, such as has been made in the present case, is justified, or a weakness in it manifested through actual trial is found to exist, the remedy or relief rests clearly within the relation

between employer and employee contemplated by the legislative system for retirement pay. The legislature may from time to time, within the confines of that established relation, alter, change, amend, and render intact the actuarial soundness of the system so as to strengthen its fibers in any way it sees fit. Changes in details, such as length of service required, contributions needed, and age requirements, to keep the fund on sound actuarial practices, are essential. Flexibility in component parts is a paramount necessity to guard against changed conditions and to permit keeping abreast with actuarial science. The basis is contribution from the county or state and from employee members.

Some states hold that the contributions of the employees are not salary inasmuch as the amount compulsorily contributed never reached them, but was withheld by the state or municipality; and, therefore, a member of a retirement or pension fund has no vested interest in such contributions, but the fund remains in the unrestricted and absolute control of the state or municipality which may seize and divert it entirely to any purpose deemed fit.[12] This was held to be so even after the employee has qualified under a particular act.[13] If this is true, then the employee could not complain of the matter here involved. Such cases, however, involve statutes which do not give a right to the member to withdraw the amounts deducted from his salary because no part of the contributor's money is in the fund, but only public moneys, and nearly all the cases involve changes

---

[12] Hughes v. Traeger, 264 Ill. 612, 106 N. E. 431 (1914); Pecoy v. Chicago, 265 Ill. 78, 106 N. E. 435 (1914); Beutel v. Foreman, 288 Ill. 106, 123 N. E. 270 (1919); Head v. Jacobs, 150 Ky. 290, 150 S. W. 349 (1912); State v. Board of Trustees, 121 Wis. 44, 98 N. W. 954 (1904).

[13] People v. Hanson, 330 Ill. 79, 161 N. E. 145 (1928); Head v. Jacobs, supra; Gibbs v. Relief Assn., 125 Minn. 174, 145 N. W. 1075 (1914).

by amendments to the laws, in what may be called "actuarial" or business management features.[14]

An analysis of this and other retirement acts in this Commonwealth shows they are built on a different basis. The legislature, in effect, makes this offer to the employee: The state or municipality will contribute so much money to a fund and you will contribute to the same fund for a given time on the basis of service performed. Conditions or qualifications are added for the benefit of the fund and the employee. The right is given to the employee to cease payment and withdraw from the fund, recovering back his contribution, when his services end, under section 324, Act of 1929. It is difficult to understand where this relation lacks the elements of an executory contract if the employee and the state have directly or indirectly made any payments on account of it. See Lynch v. U. S., supra. The state and its agencies are as certainly bound by their contracts as are individuals.

The employee's contributions are as much wages or salary when deducted at the source as though they had been paid directly, and in Allegheny County they are paid directly. The legislature so recognizes this principle in that county and elsewhere when it permits the employee to withdraw under given circumstances from the association and take back his contribution as salary. But the funds the county or state contributes are absolutely vested in the system that has been created by it, except the right of withdrawal just discussed. To hold otherwise for the reason that employee contributions are not wages when compulsorily deducted would not only be unfair and unjust, but would circumvent all known equities. Especially is this true when the interest of a

---

[14] Lengthened service and added age requirement: Pecoy v. Chicago, 265 Ill. 78, 106 N. E. 435 (1914); added age requirement: Beutel v. Foreman, 288 Ill. 106, 123 N. E. 270 (1919); altered definition of widow: Gibbs v. Relief Assn., 125 Minn. 174, 145 N. W. 1075 (1914); added service requirement: State v. Board of Trustees, 121 Wis. 44, 98 N. W. 954 (1904).

retired employee in the reserves is denied after his salary has been made to contribute thereto for years, and he is beyond an age when his usefulness as a provider is intact. To take an amount or to require an amount to be paid from a salary is a *de*duction of part of the salary and not a *re*duction of salary. To take this earned salary and deny any vested right in it is against fair dealing.

The State's contributory reserve retirement systems are in a healthy condition. The managers have, indeed, increased the assets through prudent investment. To hold that the State can be authorized to abolish the system and take over all these moneys is unthinkable. It is true the State has control of the revenues of municipalities as well as of its own, and while they are in hand may do with them as it pleases; but when it contributes them to a purpose recognized as being within the Constitution, and they are actually received by the designated objects, the legislature cannot reclaim them simply because it changes its mind.

While an employee may have an interest or vested right in the fund to protect it from insolvency, that right cannot be worked out by refusing to contribute, but rather in an effort to compel the county in a proper proceeding to make good its payments as directed by the legislature, or to redress other bad practices.

The difficulty with these local contributory reserve retirement systems is the careless manner in which they are managed, and the lack of central supervision which will keep them actuarially sound and prohibit dishonest or unfair practices. It may be that many of these agencies are in a precarious position because of the want of supervision. The State, when it creates an agency of this character, could go one step further and provide, as it has provided for its own retirement institutions, strict supervision to guard against improper actuarial and management practices.

Section 317 of article III uses the phrase: "The county commissioners shall, annually in January, appro-

priate and pay into the pension fund not less than one-half of one per centum, and not more than two per centum, of all available moneys received by the county as taxes during the preceding calendar year." The question is: What are the available moneys received by the county as taxes? Available money received as taxes means money received from taxes, usable for any purpose. The requirement of the act that the county shall annually appropriate and pay, means that it must appropriate and pay not less than one-half of one per cent of such available moneys, and pay the maximum amount as required by the retirement board if necessary to make the fund actuarially sound.

Decree affirmed at cost of appellants.