# Osborne et al. v. United Gas Improvement Company et al.

384

*Victor Frey,* of *Frey & Campbell,* and *Sydney C. Orlofsky,* for plaintiffs.

*Sigmund H. Steinberg,* of *Blanc & Steinberg,* and *Alexander Kahn,* for intervening plaintiff.

*Thomas B. K. Ringe* and *William Clarke Mason* of *Morgan, Lewis & Bockius,* and *Kenneth B. Anderson,* for defendants.

MacNeille, P. J., and Milner, J., December 5, 1944.— . . .

Plaintiffs by this proceeding in equity seek to enjoin the carrying into effect of a proposed pension plan for employes of The United Gas Improvement Company (hereinafter referred to as U. G. I.), approved by its board of directors and a majority of its stockholders at a special meeting held on February 29, 1944, when of 23,252,005 shares outstanding 13,582,097 shares were voted for the plan, and 1,698,165 shares were voted against it.

The complaining minority stockholders who are parties to this suit contend that the pension plan (which is referred to in the pleadings as the Retirement Annuity Plan) is illegal and its adoption is in violation of the rights of plaintiffs and of the minority stockholders, because:

1. The proxy sent out by the management of U. G. I. to its stockholders "failed to disclose the facts fully and in sufficient detail to enable stockholders to learn the full truth and all details and particulars concerning the said Retirement Annuity Plan".

2. The proxy of the United Corporation as the holder of about 6,000,000 shares of U. G. I. stock voted at the special meeting of stockholders of U. G. I. was void because the stockholders of the United Corporation had not been called upon to approve or authorize the proxy.

3. U. G. I. is committed to liquidation.

4. The plan is unreasonable in that it provides for the payment of amounts which are excessive to certain U. G. I. officers.

5. The plan is illegal and is without consideration because it provides for payments for past service to persons who have already been fully compensated for their services.

6. The company does not have sufficient earnings out of which to make the payments to effectuate the plan.

7. The plan provides for appropriation of stockholders' money and property "without a benefit in return".

8. The plan is unconstitutional, illegal, and void.

We will take up the objections made to the plan seriatim.

1. Plaintiffs contend that the proxy information or statement sent out to stockholders by the management failed to fully disclose all pertinent facts with respect to the Retirement Annuity Plan. The proxy statement itself was received into evidence and is a part of the communication addressed to the stockholders by Walter E. Long, president of U. G. I., under date of January 24, 1944, including a printed letter of a page and a half, a formal notice of the special stockholders' meeting, and the "proxy information" itself, which devotes four large printed pages to a clear and factual discussion of the Retirement Annuity Plan to be presented to the stockholders at the special meeting. This proxy statement sent out by U. G. I. was submitted to the proper division of the Securities and Exchange Commission of the United States. The pleadings in this case disclose that counsel for plaintiffs herein appealed to the Securities and Exchange Commission to intervene and adjourn the special meeting of the stockholders, and the Securities and Exchange Commission refused to interfere therewith. It is clear from an examination and reading of the proxy statement itself, and from the action of the Securities and Exchange Commission in refusing to interfere with the voting by the stockholders on the plan, that the statement is complete, sufficient, and adequately informative.

The vote of an overwhelming majority in favor of the plan, and the fact that such a vote could have been received only after investigation by the holders of large amounts of U. G. I. stock which comprise many of the important financial institutions in Philadelphia and

elsewhere, also indicate that upon the basis of the information supplied those holders were sufficiently informed of the plan and were satisfied to give the management their proxy to vote in favor of the plan.

We are of the opinion that the contention of plaintiffs in this respect is without any basis whatever and that the proxy statement contained all necessary information for the guidance of the stockholders.

2. A question has been raised by plaintiffs with respect to the manner in which the U. G. I. stock owned by United Corporation was voted at the special stockholders' meeting, at which time the pension plan was approved. Plaintiffs contend that the proxy covering the United Corporation stock should have been approved by a majority of the stockholders of the United Corporation. Defendants admit it was not so approved. Statement no. 3 in defendants' exhibit no. 3, constituting a "supplement to record", includes at its end a copy of the resolution adopted by the board of directors of the United Corporation on February 16, 1944, authorizing the president of that corporation to execute and deliver the management proxy at the U. G. I. special stockholders' meeting held on February 29, 1944. The president of United Corporation executed and delivered the proxy, and as a result the stock was voted in favor of the plan.

The Business Corporation Law of May 5, 1933, P. L. 364, sec. 508, provides:

"A corporation owning shares in another corporation may vote the same by its president, or by proxy appointed by him, unless some other person, by resolution of its board of directors, shall be appointed to vote such shares, in which case such person shall be entitled to vote the shares upon the production of a certified copy of such resolution."

This provision is taken from the Uniform Corporation Act and is the general law in effect in most jurisdictions. See 13 Am. Jur. 531 (Corporations §493).

It is thus seen that the United Corporation stock was legally voted, and in any event if the vote of this stock is disregarded it is readily apparent that the result would not be altered because the votes in favor of the plan would still constitute an overwhelming majority.

3. Plaintiffs contend that the U. G. I. is committed to liquidation of the remaining assets of the company and to dissolution, and that it "will not be a going company, actively engaged in business, for longer than five years at the utmost from January 1, 1944".

The provisions of the Federal Public Utility Holding Company Act of August 26, 1935, 49 Stat. at L. 803, apply to defendant corporation. While it is true that the provisions of that act require geographical limitation and corporate simplification of holding companies, of which defendant corporation is one, those provisions neither require nor contemplate either liquidation or winding up. In integration proceedings before the Federal Securities and Exchange Commission under section 11 (e) of the Public Utility Holding Company Act, a plan was adopted for the divestments by the U. G. I. of certain securities and other assets, as a result of which it has divested itself of certain securities, including stock in the Philadelphia Electric Company, Public Service Corporation of New Jersey, Delaware Power & Light Company, and other companies, and stock in these companies were distributed, together with cash, to its stockholders or exchanged in certain instances for its own preferred stock which it retired.

In 1942 the book value of the assets of the company was $332,764,642, and in April 1944 was $99,233,819, with an estimated market value of $52,500,000. Its income in 1940 was $22,565,000 and its estimated income for the year 1944 will be $728,951. It still has majority stock investments in a number of subsidiary companies and substantial investments in the securi-

ties of other companies. In the integration proceedings the plan evolved by the management of U. G. I. included the following provision:

"Although not presently contemplated, the plan may be consummated, if deemed advisable, by the formation of a new corporation under the Business Corporation Law of the Commonwealth of Pennsylvania, which corporation would take over all of the assets and assume all of the liabilities of U. G. I. excepting for the assets distributed and liabilities discharged by the plan; the capital stock of any such new corporation would be distributed pro rata to the holders of U. G. I. common stock."

In other words, at the time of the promulgation of the plan of distribution, U. G. I. advised its stockholders that it was going to distribute to the holders of its preferred stock "in retirement and liquidation thereof and exchange therefor" Philadelphia Electric Company stock and cash, that it was going to distribute to its common stockholders Philadelphia Electric Company stock, Public Service Corporation of New Jersey stock, and Delaware Power & Light Company stock; and that it reserved the right to form a new corporation to which might be transferred the balance of the assets of U. G. I., all the stock of which corporation would be distributed to those holding common stock of U. G. I. and in exchange therefor.

In the hearings which were had upon the plan certain of the U. G. I. officers and counsel, when asked questions with respect to this feature of the plan, replied definitely that the provisions of the plan would be adhered to. As testified to by Mr. Bodine at the trial of this case, they then had in mind among other ideas the possible formation of a new corporation to carry on the residue of the company.

After the plan had been made effective and following studies, it was found that the cost of forming a new

company and the taxes which would have to be paid in the process of bringing it into existence, including the transfer to the stockholders of the stock of the new company, would be so burdensome and expensive as to make that idea virtually impossible of being carried into effect. Accordingly, the idea of forming a new company and the transfer to it of the assets of the U. G. I. were abandoned as wholly impractical.

It is true, as contended by plaintiffs, that witnesses called by defendants before the Securities and Exchange Commission in the integration proceedings prior to 1944 gave testimony which would indicate that the management had contemplated liquidation. However, the only testimony before this court with regard to the position of the company in regard to liquidation was given by Mr. William W. Bodine, who was called as a witness by plaintiffs. Mr. Bodine was president of the company from December 1940 to September 1, 1943. He is now chairman of the executive committee. He testified that the company now has no plan or thought of liquidation or dissolution and that the activities of the company will continue about as they are now.

Plaintiffs also point to the fact that preferred stock of U. G. I. was retired at $100 a share and accrued dividends, which was the amount to which the holders were entitled in case of liquidation, and that if the stock was called the holders were entitled to $110 a share.

However, the evidence of the present plans and intentions of the company presented in the testimony before us and the evidence presented in regard to the present corporate set-up and operations of the company preclude us from a finding that the U. G. I. is presently contemplating or planning liquidation or dissolution.

4. Plaintiffs complain that the amounts payable to certain officers of U. G. I. under the proposed pension

plan are excessive. Plaintiffs offered no testimony in support of their position. The only witnesses who were called with respect to the amount of these payments were Mr. Bodine, who was called by plaintiffs, and Mr. Forster, an expert, who was called by defendants. Both testified that the compensation now paid and the payments to be received under the plan were fair and reasonable. Indeed, Mr. Forster testified that the amounts payable and the limit of $10,000 were not unreasonably liberal, and that it was about average for a company where the maximum salary was that of Mr. Long, the only person who can expect to receive $10,000 per year at the expiration of five years from the date when the plan becomes effective. From the testimony submitted it appears that the cost to the company will be less than the continuation of the present informal plan. It is, therefore, apparent that not only is the cost an appropriate one, as testified to by Mr. Forster, but that the company will in fact save money through its adoption, as testified to by Mr. Bodine.

Indeed, counsel for plaintiffs stated frankly that he did not contend that the plan was a "wasting of U. G. I. assets".

The pensions provided for are not out of line with the salaries paid to the officers or the duties and responsibilities with which they are charged. We cannot find them excessive or unreasonable in amount. The stockholders by the vote of a decisive majority have approved them, and we cannot substitute ourselves for the board of directors or stockholders of the company and substitute our determination as to the amounts to be paid for theirs.

5. Plaintiffs, citing that line of cases which hold that a corporation is without power to pay compensation to an officer or employe for past services, contend that because the pension plan of U. G. I. provides for the payment of approximately $765,000 in a lump sum (as of the effective date of the plan) to the insurance com-

pany under the provisions of the contract it is invalid on the ground that the said $765,000 is in effect a premium paid covering the period of time preceding the effective date of the plan during which the employes to be covered have been employed, and is therefore a payment for past services.

The fallacy in this contention is immediately apparent, because it wholly overlooks the provisions of section 316 of the Business Corporation Law of Pennsylvania, which expressly provides for the granting of allowances or pensions "for faithful and long-continued service". From this language it is apparent that the law of Pennsylvania approves and intends to stimulate such payments, which can be described in no other terms than for "past services".

It is clear that under any plan providing for retirement annuities an employe who reaches a normal retirement age within a few years after the adoption of the plan cannot during those few years accumulate an adequate retirement allowance from the service which he renders after the establishment of the plan. To enable such employes to retire upon an adequate allowance, it is necessary and usual, and in accordance with modern corporate practices, to supplement, at the expense of the employer, the allowance based upon future service. This supplement is provided through additional retirement allowance by reference to service rendered before the establishment of the plan, which in this proceeding has been described as "past service". This is a reasonable, proper, and customary provision to accomplish the systematic retirement of such employes. This is shown in the following regulatory commission cases: City of Erie v. Mutual Telephone Co., P. U. R. 1931A, 169; Taxpayers Protective Association v. Lehigh Water Co., noted in P. U. R. Dig. Supp. 1933-39, vol. A, p. 673; and In re Rochester Gas & Elec. Corp. (1940), 33 P. U. R. (N. S.) 393, 499; and is the law in all jurisdictions where the question has been

raised. The subject was well summarized in a note on the legal status of private industrial pension plans appearing in 53 Harv. Law Rev. 1375, at p. 1383 (1940), where it was said:

"The prime essential of sound financing is that individual annuity reserves be set aside for every employee concurrently with the service rendered by him; and, as a corollary, that an additional sum be set aside representing the present value of the reserves that should have been but were not set aside in years past to cover all employees now on the payroll."

The consideration required to support the contract is found not only in the necessity for future services, but also in the reliance of the employes and officers in the past upon the expected benefits which they would obtain under the preëxisting informal plan. It is well settled in Pennsylvania that under proper circumstances a moral obligation may be sufficient consideration to support an express promise. See the long line of authority to this effect in Vale's Digest, "Contracts", sec. 76. Also it was so held in Sutch's Estate (No. 1), 201 Pa. 305 (1902).

6. The Business Corporation Law of 1933, sec. 316, provides:

"Every business corporation may grant allowances or pensions out of the earnings of the corporation to its directors, officers, or employes, for faithful and long-continued service, who have, in such service, become old, infirm, or disabled."

There is, in addition, the Act of May 6, 1943, P. L. 170, sec. 1, which provides:

". . . corporations organized for profit under the laws of the Commonwealth of Pennsylvania and subject to the provisions of this act may, out of the earnings of said corporation, grant allowances or pensions to officers or employes for faithful and long continued service, who have, in such service, become old, infirm or disabled.

"Provided, That the provisions of this act shall not apply to any director of any such corporation who is not an officer or employe of said corporation."

It is to be noted that both these statutes require that pensions be paid only "out of the earnings" of the corporation.

Plaintiffs maintain that the U. G. I. does not have sufficient earnings out of which to make the payments necessary to carry the plan into effect and, furthermore, the earnings contemplated under the above statutes are current earnings. With plaintiffs' reasoning we cannot agree. The cost of the past service annuities under the plan is $765,000, and approximately $28,000 is annual premium for future service annuities. The U. G. I. has in its earned surplus account an excess of $17,000,000. Its estimated net income for the year 1944 will be about $728,951. Defendants have placed in evidence a detailed statement of the make-up of its earned surplus account each year since 1882. This shows that in arriving at the present earned surplus of more than $17,000,000 there have been included not only the earnings from the regular operations of the company, but also the profits (net of losses) from the sale of securities.

Plaintiffs maintain that the profits from the sale of securities are capital gains and should not be considered in arriving at the amount of the present earned surplus.

Plaintiffs are misled by a seeming resemblance of facts to those where an individual is taxed upon a profit on a sale of a capital asset.

The U. G. I. has the charter power to hold, own, buy, and sell securities. To do so is one of the corporate purposes for which it was organized and is existing. It also has the statutory power to do so: Business Corporation Law, sec. 302. It has exercised this power continuously since 1884. Therefore, the profits it realizes from the sale of securities are in reality its earnings

from its operations. As a matter of fact it is a holding company and not an operating company, and its other regular or normal earnings are derived almost entirely from dividends from companies in which it has made investments. The criteria for deciding what are earnings from the normal operation of other businesses or for services performed by other types of corporations do not necessarily apply in the case at bar. We are therefore of the opinion that it is proper to include the profits from sales of securities in arriving at its earned surplus.

In this connection it is important to bear in mind the vital distinction between "earned surplus" and so-called "capital surplus".

In Montgomery, Auditing Theory and Practice (6th ed., 1940) 362, 363, the experienced author writes:

"Earned Surplus — Earned surplus (or deficit) should be shown separately on the balance sheet. To this account should be transferred the net results from operations, including profits and losses from the sale of fixed assets. It should be debited with transfers to appropriate surplus accounts, payments of dividends, and such extraordinary charges as write-off of goodwill or other intangible assets as may be sanctioned by the board of directors and by accepted accounting practice. . . .

"Profit on the sale of fixed assets should be credited not to capital surplus but to earned surplus (usually through the statement of income)."

Conversely, in a discussion of so-called "capital surplus" the same treatise declares (p. 363):

"Capital Surplus. The term 'capital surplus' is sometimes used to describe any type of surplus other than earned surplus. Such use should be discouraged on the ground that it is not sufficiently informative. Good accounting practice requires that the balance sheet indicate by reasonably descriptive titles the sources of 'capital surplus' balances."

The author then lists, as the more usual transactions or conditions which result in so-called "capital surplus", as distinguished from "earned surplus", the following: (1) Sales of par value capital stock at prices in excess of par; (2) sales of no par value stock in which part of the proceeds is designated as the stated value of capital stock and the remainder is allocated to "paid-in" surplus; (3) the reduction, with proper corporate and legal authority, of the par or stated value of previously issued capital stock; (4) resale of a corporation's own fully-paid and nonassessable stock which was donated to it; (5) assessment on stock after its par value has been paid in; (6) forfeited payments on stock subscriptions; (7) merger of companies resulting in capitalization of earned surplus; (8) excess of the relative proportion of the book amount of net assets of subsidiaries, as at dates of acquisition, over the parent's investment in such subsidiaries; (9) excess of par or stated value over cost of treasury stock when retired or where not reissuable; (10) resale of treasury stock at a profit (when a certain accounting procedure is followed); (11) revaluations of fixed or other assets resulting in increases in the recorded amounts of such assets.

Plaintiffs suggest that because a total of $52,000,000 was appropriated from earned surplus to contingent reserve and reserve for possible losses on investments during the period from June 1, 1882, to April 30, 1944, and during the same period the accumulation of earned surplus from "regular sources" of income, after deduction of dividends, amounted to only $28,818,559, while profits from sales of securities and adjustment of investments totaled $40,283,216, it cannot be found affirmatively that the earned surplus balance of $17,-101,776, as of April 30, 1944, contains any earnings from "regular sources". This suggestion is then coupled with the argument that "earnings" excludes profits on sale of assets, and the conclusion is reached by plain-

tiffs that there is no certainty that the lump sum to be paid for past service annuities will be paid out of "earnings" within the meaning of section 316 of the Business Corporation Law. Plaintiffs' reasoning is unsound because:

First. The nature and purpose of the contingent reserve for possible losses on investments must be considered. The origin and development of this reserve account is as follows: (a) A resolution of the executive committee of the board of directors of U. G. I. adopted January 11, 1933, directed the proper officers of the company to cause entries to be made on the books of the company setting up a contingent reserve account of $15,000,000 and charging earned surplus account with that amount, such entries to be made as of December 31, 1932; (b) a resolution of the board of directors, dated December 26, 1934, directed the proper officers of the company to cause entries to be made on the books of the company transferring $20,000,000 from earned surplus account to contingent reserve account, such entries to be made as of December 31, 1934; (c) under an amended plan of March 16, 1943, which provided for divestment of certain securities and other assets of U. G. I. in compliance with section 11(e) of the Public Utility Holding Company Act of 1935, and which was approved by resolution of the board of directors, a new name, i. e., "Reserve for Possible Losses on Investments", was given to the account to which, in addition to the transfer of the balance in the contingent reserve, the sum of $17,000,000 was appropriated from earned surplus.

The primary purpose of the reserve was to meet possible losses sustained in disposing of securities and other investments at less than their cost. Accordingly, it should seem to be fair and reasonable and the part of common sense that such losses, when and if sustained, should be met in the first instance out of undistributed gains previously realized from the sale of

other investments. On logic and reason, therefore, the court should in fairness adopt the presumption that all the net profit ($40,283,216) realized from the sales of securities and adjustment of investment accounts was appropriated to contingent reserve and reserve for possible losses on investments. In that event, although the balance of such reserves (about $12,000,000) would necessarily come from earned surplus attributable to earnings from "regular sources", the earned surplus balance of $17,101,776 as of April 30, 1944, would consist wholly of earnings from such "regular sources".

Second. The futility of the view that the transfer of $52,000,000 of earned surplus to contingent reserve and reserve for possible losses may have removed from the earned surplus account so much of the earnings attributable to "regular sources" of income as would leave an insufficient amount thereof to meet the cost of past service annuities under the U. G. I. pension plan is further demonstrated by the fact that, through the simple expedient of another book entry (and with the approval of the appropriate regulatory authorities), the amounts in those reserves might be transferred back to earned surplus, thus insuring that earned surplus would contain earnings from "regular sources" sufficient to pay the cost of the past service annuities and leaving a balance ample to meet all contingencies.

In defendants' exhibit no. 3, statement no. 2, a schedule is given showing the book value and estimated present value of certain of its holdings. Some show an excess of estimated value over cost. The total of such excess is about $11,000,000. Plaintiffs in their brief maintain this $11,000,000 was included in the figures making up the earned surplus. It is argued (erroneously, in our opinion) that if contingent liabilities of defendant corporation and possible liabilities under guaranties noted in the balance sheet of U. G. I. set

forth in defendants' exhibit no. 4 part 3-C, are added to this sum of $11,000,000 there is not sufficient earned surplus to justify the annuity payments. This is due to their misconception of the meaning of the statements submitted by defendant corporation from an accounting standpoint. Plaintiffs are in error. No such excess of estimated value over book values or write-ups has been included in the earned surplus. The estimated values are given in the statements in accordance with accepted accounting practice to make a comparison with the amounts carried as "contingent reserves or reserves for possible losses", and to show that such reserves are adequate and reasonable. As a matter of fact the excess of reserve over estimated present possible losses is $6,407,613. The assets set forth on the balance sheet of the company are not carried at estimated or enhanced values but at the cost thereof as shown by the books of the company.

The earned surplus balance as of April 30, 1944, of $17,101,776 is, of course, adequate to meet the $765,000 which the pension plan requires to be charged to earned surplus to meet the cost of annuities attributable to years of reserve antedating adoption of the plan. The estimated current revenue of $728,951 is likewise adequate to meet the annual charge of $28,000 for annuities attributable to future service, even granting that the payments under the informal plan previously existing in the company are carried on.

7. Finally, plaintiffs assert that the plan is unconstitutional, illegal, and void. We have seen that pension plans by corporations are expressly authorized by the laws of Pennsylvania. In Busser et al. v. Snyder et al., 282 Pa. 440 (1925), at page 447, the late Chief Justice Kephart made the significant observation:

"We may add, however, that, as industrial evolution has worked a marked change in economic life, bringing about to a large extent the conditions complained of by the proponents of the act, the moral duty rests on these

industrial organizations and other employers of labor to provide the system and means to take care of old age, and those dependent thereon; this is a primary rule of the present economic period."

See also Heinz v. National Bank of Commerce in St. Louis et al. (C. C. A. 8th, 1916), 237 Fed. 942, and Gilbert v. Norfolk & Western Railway Co. et al., 114 W. Va. 344, 171 S. E. 814 (1933), wherein, at page 348, it was said:

"The creation of pension funds for corporations has been uniformly sustained in the few cases in which the question of their validity has arisen."

Although defendant corporation entitled its plan a Retirement Annuity Plan, it is undoubtedly a pension plan within the meaning of the laws of Pennsylvania. See Retirement Board of Allegheny County v. McGovern et al., 316 Pa. 161.

We are of the opinion that the plan is constitutional, legal, and valid.

Under section 165(a) of the United States Internal Revenue Code, as amended, it is provided that "a trust forming part of a . . . pension . . . plan for the exclusive benefit of . . . employees or their beneficiaries shall not be taxable" under the code. The code and the regulations made thereunder set up certain standards to be met in order for a plan to be accepted as a pension plan under the code, e. g., that the "benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employes, or highly compensated employes", etc.

Defendant corporation submitted the pension plan to the Commissioner of Internal Revenue of the Treasury Department of the United States for a ruling as to whether the proposed pension plan will meet the requirements of the above-mentioned section of the Internal Revenue Code. The Commissioner of Internal Revenue by letter dated November 15, 1944, informed the company that the proposed plan, with certain

amendments suggested by the Treasury Department, "will meet the requirements of section 165(*a*) of the Internal Revenue Code, as amended", and that "contributions made to the plan will be allowable as deductions from gross income in accordance with the provisions of section 23(*p*) of the Internal Revenue Code, as amended, the amount thereof being subject to verification upon examination of your tax return".

The amendments suggested by the Treasury Department are with respect to minor details of the plan and do not affect the decision in this case. The plan as originally proposed provided for past service annuities only for employes whose effective date of coverage was the effective date of the proposed insurance contract. In case of employes whose effective date of coverage was subsequent to the effective date of the contract no past service annuities were to be purchased. The most important amendment remedies the situation by provisions as to past service annuities for employes whose effective date of coverage is later than the effective date of the contract.

The Treasury Department submits trusts established by employers for the benefit of employes and pension plans to careful scrutiny in order to prevent the evasion of income taxes. A large and increasing number of corporations are submitting proposed pension plans to the department. The decisions of the Treasury Department and the courts show that such plans are not recognized for the purpose of tax deduction allowances which are illegal or discriminatory or devised to syphon assets of the corporation into the hands of favored individuals; therefore the approval of the plan by the Commissioner of Internal Revenue is persuasive of the legality of defendant corporation's proposed pension plan.

At the hearing held on October 25, 1944, plaintiffs objected to the reception of defendants' exhibit no. 3 on the ground that the facts therein contained were irrelevant and immaterial. The statements contained in

that exhibit show in detail the earnings of the company, its expenditures, amounts paid in dividends, amounts paid in contingent reserves for losses, amounts carried into the earned surplus account, and the net amounts from regular or normal operations of the company, and from the sale of securities, year by year, since 1882, etc. They are relevant and material to the very issue which plaintiffs raise and are necessary for a determination of the question by the court. Ruling on the objection was reserved. It is now overruled.

There is no allegation or proof of bad faith or mala fides or fraud in this case. There is no evidence of waste or that the amounts of the pensions are unreasonably excessive or beyond the ability of defendant corporation to pay the cost thereof. The company has the earnings out of which to make the same, and the establishment of the plan is of benefit to the company in relation to its officers and employes. No one takes issue with a corporation when it sets up reserves against the depreciation and obsolescence of its physical property, and under enlightened modern conditions it is equally advantageous and beneficial to the corporation as well as humane for it to provide for the depreciation of the human beings in its employ through age or long-continued service, by keeping up their interest in the welfare of the corporation and their morale by providing them with protection against the disabilities of age after years of faithful service.

We are, therefore, of the opinion that the bill in equity in this case must be dismissed.

Inasmuch as plaintiff minority stockholders have brought this action in good faith and it is of advantage to defendants to secure an adjudication as to the validity of its pension plan, we are of the opinion that the costs in this case should be divided equally between the parties.

---

NOTE.—Exceptions to the foregoing adjudication were dismissed and a final decree entered on March 19, 1945.